Opinion by Judge BYBEE; Dissent by Judge RAWLINSON.
*966 OPINION
BYBEE, Circuit Judge:
Since 1973, a regulation promulgated by the Department of Veterans Affairs (VA), 38 C.F.R. § 1.218, has prohibited the posting of materials on VA property except when authorized by the head of the VA facility in question or a designee of that individual, or when the posting of materials is part of authorized Government activities. See 38 C.F.R. § 1.218(a)(9); see also Security, Law Enforcement, and Standards of Conduct on Veterans Administration Property, 38 Fed.Reg. 24,364, 24,365 (Sept. 7, 1973) (to be codified at 38 C.F.R. pt. 1). This case arises from the inconsistent enforcement of § 1.218 as applied to Robert Rosebrock.
Rosebrock is a veteran who objects to the failure of the VA to use a lawn outside of the Los Angeles Campus (LA Campus) of the VA Greater Los Angeles Healthcare System (VAGLA) for the benefit of veterans, and particularly homeless veterans. Since March 2008, Rosebrock and a group of like-minded veterans have protested weekly outside of the locked fence that surrounds the LA Campus lawn to draw public attention to the VA’s failure to use the lawn for veterans. Although neither VAGLA nor the VA has ever had a general policy of inconsistent enforcement of the prohibition on posting materials in § 1.218, VAGLA and its police force inconsistently enforced the regulation in response to these protests. In particular, over a period of at least eight months, VAGLA and its police failed to enforce the regulation when Rosebrock and his fellow protestors hung the American flag union up on the fence surrounding the LA Campus lawn, but enforced the regulation when the protestors hung the American flag union down on the fence. Based on the record before us, this inconsistent enforcement stopped on June 30, 2010, when a VAGLA associate director sent an email to the VAGLA police instructing them to consistently enforce the prohibition in the regulation.
While the inconsistent enforcement was ongoing, Rosebrock filed a complaint in the United States District Court for the Central District of California, bringing a cause of action under the First Amendment, and seeking declaratory and injunc-tive relief. The district court ultimately granted summary judgment to Rosebrock with regard to declaratory relief, holding that the VA defendants violated Rose-brock’s First Amendment rights by engaging in viewpoint discrimination, but the district court denied Rosebrock any in-junctive relief. Rosebrock v. Beiter, 788 F.Supp.2d 1127, 1140-49 (C.D.Cal.2011). One of the rationales given by the district court for denying injunctive relief was that the request for injunctive relief had been mooted by the June 30, 2010 e-mail instructing the VAGLA police to enforce § 1.218 consistently. Id. at 1143-45.
Before us now is Rosebrock’s appeal from the district court’s denial of injunc-tive relief. We agree with the district court that Rosebrock’s requests for injunc-tive relief are moot, and thus we affirm.
I
Pursuant to its authority to “make all needful rules and regulations for the governing of the property under [the Secretary of Veterans Affairs’] charge and control” under the National Cemeteries Act of 1973, Pub.L. No. 93-43, § 4, 87 Stat. 75, 79 (codified as amended at 38 U.S.C. § 901), the VA promulgated 38 C.F.R. § 1.218 in 1973. See Security, Law Enforcement, and Standards of Conduct on Veterans Administration Property, 38 Fed.Reg. at 24,364-65. This subsection has not materially changed in the nearly forty years since its promulgation. Compare Security, *967 Law Enforcement, and Standards of Conduct on Veterans Administration Property, 38 Fed.Reg. at 24,365 (subsection (i)), with 38 C.F.R. § 1.218(a)(9). Today’s version reads as follows:
Distribution of handbills. The distributing of materials such as pamphlets, handbills, and/or flyers, and the displaying of placards or posting of materials on bulletin boards or elsewhere on property is prohibited, except as authorized by the head of the facility or designee or when such distributions or displays are conducted as part of authorized Government activities.
38 C.F.R. § 1.218(a)(9). According to a declaration from the VAGLA police chief who is a defendant in this suit, VAGLA policy has always been strict enforcement of the prohibition on posting in § 1.218(a)(9). There is no evidence in the record suggesting that VAGLA or the VA has ever had a general policy of inconsistent enforcement. Accordingly, this ease arises not from the regulation itself, or from a general VAGLA or VA policy with regard to its enforcement, but rather from inconsistent enforcement of the regulation by VAGLA and its police officers on the ground in this particular case.
II
VAGLA is one of the largest and most complex VA healthcare systems in the country. The LA Campus is the only VAGLA location in the Los Angeles region where complex medical, surgical, and psychiatric care is offered. Rosebrock and other veterans protest for three to four hours each Sunday outside of the locked fence that surrounds the LA Campus lawn to draw public attention to the VA’s failure to use the lawn for veterans. During these protests, which began on March 9, 2008, Rosebrock initially hung the American flag union up on the fence, along with a POW/MIA banner. Sometimes, Rose-brock would also hang a Vietnam unit flag and a “Support Our Troops” banner on the fence. When Rosebrock hung the American flag union up, he intended to express patriotism, and a message of honor and support for the U.S. military. VAGLA police had informed Rosebrock that the posting of materials on the LA Campus fence was prohibited by federal regulations, but, in spite of the broad prohibition in § 1.218(a)(9), they had also informed him, incorrectly, that there was an exception covering the American flag and POW/ MIA banner.[1]
VAGLA police and staff did not confront Rosebrock about hanging the Vietnam unit flag and “Support Our Troops” banner— neither of which was covered by the stated exception — until November 30, 2008, when a VAGLA police sergeant asked Rose-brock to remove them. Consistent with the stated exception, the VAGLA police sergeant told Rosebrock that the union-up American flag and POW/MIA banner, which were right next to the flag and banner that had to be removed, could remain on the fence. For the seven months following this confrontation, Rosebrock continued to hang the union-up American flag and the POW/MIA banner on the fence, and the VAGLA police did not interfere. According to VAGLA, VAGLA and its police refrained from citing Rosebrock to avoid confrontation with demonstrators, which VAGLA feared could escalate the fervor of the protests. VAGLA and its police, many of whom were veterans themselves, were also reluctant because many *968 of the demonstrators were elderly veterans.
Rosebrock grew increasingly upset with the situation involving the lawn, and, as a result, beginning on June 14, 2009, he started to hang the American flag union down rather than union up. In hanging the flag union down, Rosebrock meant to convey an entirely different message than the message he had intended to convey by hanging the flag union up. Specifically, the union-down flag was intended to convey a “distress call” regarding the VA’s use of land that, in Rosebrock’s opinion, rightfully should be used for veterans.[2]
A week after he first hung the flag union down, VAGLA police approached Rose-brock and ordered him to hang the flag union up or remove it, and Rosebrock complied by removing the flag. Shortly thereafter, on June 26, 2009, Rosebrock received an e-mail from a VAGLA associate director saying that he could “not attach the American flag, upside down, anywhere on VA property including [the] perimeter gates,” and that doing so “is considered a desecration of the flag and is not allowed on VA property.” This e-mail did not authorize Rosebrock to post any materials on VA property.[3]
On July 24, 2009, a VAGLA police patrol captain sent an e-mail to VAGLA police officers instructing them to issue citations to Rosebrock under § 1.218(a)(9) if they observed him hanging any signs or flags on the fence. According to VAGLA, it began taking action once Rosebrock began hanging the flag union down, because VAGLA received complaints from patients who were upset at seeing the union-down flag and Rosebrock himself complained that he had been threatened by individuals offended at the display. Believing that the VA was attempting to impermissibly restrict his speech, Rosebrock continued to hang the flag union down during his Sunday protests. Between July 2009 and September 2009, a period during which Rose-brock hung the American flag only union down on the fence, Rosebrock received six citations in the mail pursuant to § 1.218(a)(9). Four of the citations explicitly mentioned that the flag was hung union down. Presumably, the VAGLA police officers who had previously felt uncomfortable confronting Rosebrock felt less uncomfortable now that they were confronting him for hanging the flag union down, a sign of disrespect to our flag and country or a signal of immediate distress, and now that Rosebrock’s actions had led to complaints from patients and threats to Rose-brock’s safety.[4] All of the citations were dismissed at the request of an Assistant United States Attorney.
In February 2010, Rosebrock prominently hung American flags union up on the fence with VAGLA police nearby, but they did not interfere with Rosebrock’s display or cite him. That same month, *969 after Rosebrock had not hung the American flag union down on the fence for some time to avoid being cited, Rosebrock hung the flag union down again and was told by the VAGLA police to remove the flag and his POW/MIA banner from the fence. When Rosebrock refused, the VAGLA police removed the flag and banner.
In sum, based on the record before us, for at least eight months after Rose-brock began sometimes hanging the flag union down on the fence, and even after a VAGLA police patrol captain told VAGLA police officers to cite Rosebrock under § 1.218(a)(9) if he hung any sign or flag on the fence, VA representatives only cited Rosebrock or interfered with his activity if he hung the flag union down.[5]
In March 2010, Rosebrock filed a complaint in the United States District Court for the Central District of California, bringing a cause of action under the First Amendment, and seeking declaratory and injunctive relief. Rosebrock filed a motion seeking a preliminary injunction against the VAGLA police that would prevent them from citing him for hanging the American flag union down on the LA Campus fence. The district court denied the motion, and we affirmed in an unpublished decision. See Rosebrock v. Mathis, 400 Fed.Appx. 261 (9th Cir.2010).
On June 30, 2010, the VAGLA associate director who had previously sent Rose-brock the e-mail about hanging the flag union down sent an e-mail directive to the VAGLA police, which said the following:
I would like to confirm my office’s previous instructions to you and your department. Please ensure that VA Regulation 38 CFR 1.218 is enforced precisely and consistently. As we discussed, this means that NO outside pamphlets, handbills, flyers, flags or banners, or other similar materials may be posted anywhere on VA Property (including the outside fence/gates). This includes any flags displayed in any position. Further, the regulation only extends to VA Property. Therefore, it does NOT include the public sidewalk outside of VA Property. Accordingly, protests and/or demonstrations (including flags in any position) that take place off VA Property (on the public sidewalk) should not be interfered with. Also, please make sure that this information is disseminated to all officers who patrol the VA grounds and to the rest of your department. If you have any questions or concerns, please contact me. Thanks.
In a declaration, the VAGLA police patrol captain who sent the July 2009 e-mail *970 to VAGLA police officers about Rosebrock said it was her understanding that the VAGLA police have been strictly enforcing § 1.218(a)(9) since the associate director’s June 30, 2010 e-mail.
A few months after the June 30, 2010 e-mail, the parties filed cross-motions for summary judgment with regard to declaratory relief and permanent injunctive relief. In his motion for summary judgment, Rosebrock sought two forms of in-junctive relief: (1) a “preventive injunction” forbidding the defendants from committing viewpoint discrimination against Rosebrock going forward, and (2) a “reparative injunction” requiring the defendants to allow Rosebrock to hang the American flag union down on the LA Campus fence for 66 weeks — the amount of time, according to Rosebrock, that VA officials allowed Rosebrock to hang the flag union up on the fence without interference.
The district court granted summary judgment to Rosebrock with regard to declaratory relief, holding that the VA defendants violated Rosebrock’s First Amendment rights by engaging in viewpoint discrimination, Rosebrock, 788 F.Supp.2d at 1140-43, but denied Rose-brock any injunctive relief, id. at 1143-49. The district court denied injunctive relief on two independent bases: first, it held that the request for a permanent injunction was mooted by the VAGLA associate director’s June 30, 2010 e-mail closing the fence to all forms of speech, id. at 1143-45; and second, it held that a permanent injunction was not appropriate because the balance of equities did not tip in Rose-brock’s favor and a permanent injunction would not be in the public’s interest, id. at 1145-49.[6] The district court entered a declaratory judgment in favor of Rosebrock on his First Amendment claim. Rose-brock timely appealed, and seeks the two types of permanent injunctive relief denied him by the district court.[7]
Ill
The district court held that the June 30, 2010 e-mail instructing the VAG-LA police force to enforce § 1.218(a)(9) precisely and consistently mooted Rose-brock’s request for a permanent injunction by closing the LA Campus fence as a forum for all speech. That is, the district court held that the Government’s voluntary cessation of its inconsistent enforcement of § 1.218(a)(9) mooted the request for injunctive relief. We agree with the district court.[8]
*971 A
“A case becomes moot — and therefore no longer a ‘Case’ or ‘Controversy’ for purposes of Article III — ‘when the issues presented are no longer “live” or the parties lack a legally cognizable interest in the outcome.’ ” Already, LLC v. Nike, Inc., — U.S. -, 133 S.Ct. 721, 726, 184 L.Ed.2d 553 (2013) (quoting Murphy v. Hunt, 455 U.S. 478, 481, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982) (per curiam)). “The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed.” Knox v. Serv. Emps. Int’l Union, Local 1000, — U.S.-, 132 S.Ct. 2277, 2287, 183 L.Ed.2d 281 (2012); see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (“It is well settled that a defendant’s voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.” (internal quotation marks omitted)). But voluntary cessation can yield mootness if a “stringent” standard is met: “A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.” Friends of the Earth, 528 U.S. at 189, 120 S.Ct. 693. The party asserting mootness bears a “heavy burden” in meeting this standard. Id.
We presume that a government entity is acting in good faith when it changes its policy, see Am. Cargo Transp., Inc. v. United States, 625 F.3d 1176, 1180 (9th Cir.2010), but when the Government asserts mootness based on such a change it still must bear the heavy burden of showing that the challenged conduct cannot reasonably be expected to start up again. White v. Lee, 227 F.3d 1214, 1243-44 (9th Cir.2000); see also Bell v. City of Boise, 709 F.3d 890, 898-99 & n. 13 (9th Cir.2013).
“[A] case is not easily mooted where the government is otherwise unconstrained should it later desire to reenact the [offending] provision.” Coral Constr. Co. v. King County, 941 F.2d 910, 928 (9th Cir.1991). “A statutory change ... is usually enough to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed.” Chem. Producers & Distribs. Ass’n v. Helliker, 463 F.3d 871, 878 (9th Cir.2006). By contrast, “repeal or amendment of an ordinance by a local government or agency does not necessarily deprive a federal court of its power to determine the legality of the practice” at issue, Bell, 709 F.3d at 899 (internal quotation marks omitted), though it may do so in certain circumstances, see Santa Monica Food Not Bombs v. City of Santa Monica, 450 F.3d 1022, 1031-32 (9th Cir.2006) (holding that amendments to city ordinances had rendered facial challenges to those ordinances moot). Particularly relevant to this case, a policy change not reflected in statutory changes or even in changes in ordinances or regulations will not necessarily render a case moot, see, e.g., Bell, 709 F.3d at 899-901, but it may do so in certain circumstances, see, e.g., White, 227 F.3d at 1242-44.[9]
*972 We have not set forth a definitive test for determining whether a voluntary cessation of this last type — one not reflected in statutory changes or even in changes in ordinances or regulations — has rendered a case moot. But we have indicated that mootness is more likely if (1) the policy change is evidenced by language that is “broad in scope and unequivocal in tone,” Id. at 1243; (2) the policy change fully “addresses all of the objectionable measures that [the Government] officials took against the plaintiffs in th[e] case”, id.; (3) “th[e] case [in question] was the catalyst for the agency’s adoption of the new policy,” id.; (4) the policy has been in place for a long time when we consider mootness, see id. at 1243-44 & nn. 25, 27; and (5) “since [the policy’s] implementation the agency’s officials have not engaged in conduct similar to that challenged by the plaintiff[ ],” id. at 1243.[10] On the other hand, we are less inclined to find mootness where the “new policy ... could be easily abandoned or altered in the future.” Bell, 709 F.3d at 901. Ultimately, the question remains whether the party asserting mootness “has met its heavy burden of proving that the challenged conduct cannot reasonably be expected to recur.” White, 227 F.3d at 1244.
B
In this case, the VA action in question — the June 30, 2010 e-mail — did not effect a policy change in the typical sense because 38 C.F.R. § 1.218 has been in place, virtually unchanged, for nearly forty years, and the only evidence in the record addressing VAGLA’s or the VA’s policy regarding enforcement of the regulation suggests that VAGLA’s policy has been consistent enforcement. The June 30 e-mail seems more aptly described as reemphasizing, or recommitting to, an existing policy. In fact, by its own terms, the e-mail “conflrm[ed] ... previous instructions” to the VAGLA police. Of course, in a world of limited resources, such a reem-phasis or recommitment can always be fairly characterized as a policy change, but *973 we do not think this a distinction without a difference. In fact, we see this distinction as cutting both ways.
On the one hand, this distinction highlights that this was really a problem of enforcement, and problems of enforcement may persist in spite of an announced re-commitment to a policy. If VAGLA and its police allowed its regulation to be violated in the past without any response, the announced recommitment to a policy may not prevent similar decisions from being made in the future. Similarly, if VAGLA and the veterans on the VAGLA police force were not comfortable interfering with elderly veterans’ proper display of the American flag before, perhaps that will not change even if the brass has announced a recommitment to consistent enforcement. On the other hand, the concern with policy changes that are not cemented by statute or some other inertial form — that the purported change in policy may be gamesmanship — is not present here. Inconsistent enforcement of § 1.218(a)(9) was never general VAGLA or VA policy in the first place, and VAGLA’s recommitment to strict enforcement makes it particularly unlikely that VAGLA will change its policy in the future.
On balance, we find the latter point more compelling. We have little concern that the VA is engaged in gamesmanship where, as here, the VA states that it will be more vigilant in following a previously existing policy of consistent enforcement of a longstanding regulation. Our confidence in the Government’s voluntary cessation, see Am. Cargo Transp., 625 F.3d at 1180, is at an apex in this context. The fact that the Government’s “voluntary cessation” is more aptly described as reemphasizing, or recommitting to, an existing policy of consistent enforcement of a longstanding regulation — not as a policy change — increases our confidence that “the challenged conduct cannot reasonably be expected to recur.” White, 227 F.3d at 1244. Nonetheless, the considerations we have previously emphasized in cases involving policy changes not embodied in statutes or otherwise procedurally protected are instructive here, so we proceed to examine this case within that loose framework.
C
All of the factors that suggest mootness in “policy change” cases are present here. First, the June 30, 2010 e-mail was a clear statement, broad in scope, and unequivocal in tone. See id. at 1243. The e-mail insisted that § 1.218 be “enforced precisely and consistently,” emphasizing that this directive meant that “NO outside pamphlets, handbills, flyers, flags or banners, or other similar materials may be posted anywhere on VA Property.” The e-mail also asked its recipients to “make sure that [the directive would be] disseminated to all officers who patrol the VA grounds and to the rest of [their] department.”
Second, the e-mail fully “addresse[d] all of the objectionable measures that [the Government] officials took against the plaintiff! ] in this case.” See id. With the fence effectively closed as a forum for speech, the VA cannot engage in viewpoint discrimination with regard to the speech allowed in this forum.[11]
*974 Third, although the record does not demonstrate definitively that Rosebrock’s case was the “catalyst” for VAGLA’s re-commitment to strict enforcement of § 1.218, see id., the record strongly suggests that this is so. In particular, the email was sent shortly after Rosebrock filed his suit, and it mentions “flags in any position,” “flags displayed in any position,” and the “outside fence/gates,” — seemingly references to Rosebrock’s case.
Fourth, at this point, the VA’s recom-mitment to strict enforcement of its longstanding regulation occurred a fairly long time ago. See id. at 1243-44 & nn. 25, 27. The VAGLA associate director sent the email on June 30, 2010, more than three years ago.
Finally, based on the record before us, “since [the recommitment] the agency’s officials have not engaged in conduct similar to that challenged by the plaintiffs.” See id. at 1243.
D
We recognize that there are no procedural safeguards in place preventing VAG-LA from changing course, a factor that countenances against mootness. See Bell, 709 F.3d at 900-01. But there is little reason to doubt VAGLA’s recommitment to a preexisting policy in favor of consistently enforcing a longstanding regulation. Moreover, in light of the presumption that the Government acts in good faith, we have previously found the heavy burden of demonstrating mootness to be satisfied in “policy change” cases without even discussing procedural safeguards or the ease of changing course. See, e.g., Am. Cargo Transp., 625 F.3d at 1179-80.
In the end, we hold that the VA has satisfied its heavy burden of demonstrating mootness. We presume that the Government acts in good faith, and that presumption is especially strong here, where the Government is merely recommitting to consistent enforcement of one of its own longstanding regulations. In light of this and the other considerations outlined above, we do not think it reasonably likely that the objectionable conduct will recur. If it does, Rosebrock is well-armed with his declaratory judgment and can pursue relief in a new suit.
TV
Rosebrock’s requests for injunctive relief were properly dismissed as moot. The judgment of the district court is AFFIRMED.

. Nothing in the record suggests that any of the VAGLA police officers involved were "des-ignees” of the head of the LA Campus who could authorize Rosebrock to hang the American flag or POW/MIA banner under § 1.218(a)(9).

. Under 4 U.S.C. § 8, which is intended to guarantee that the American flag is treated with respect, "[t]he flag should never be displayed with the union down, except as a signal of dire distress in instances of extreme danger to life or property.” 4 U.S.C. § 8(a).

. Because this e-mail merely told Rosebrock that he could not post certain materials on VA property, and did not authorize Rosebrock to post any other materials, we do not view this as evidence of a general VAGLA policy of inconsistent enforcement of § 1.218(a)(9).

.Though the decision by VAGLA to refrain from enforcing § 1.218 against Rosebrock until he began hanging the flag union down demonstrates that VAGLA elected to enforce its regulation inconsistently in this instance, VAGLA's actions in this particular case do not demonstrate that VAGLA’s general policy was inconsistent enforcement. As we say elsewhere in this opinion, the only evidence regarding VAGLA's general policy suggests that the policy has been strict enforcement of the prohibition on posting in § 1.218.

. The dissent argues that 38 C.F.R. § 1.218(a)(9), by its plain terms, may not "even apply to Mr. Rosebrock’s act of hanging the American flag” because Rosebrock did not distribute anything and a “flag” differs from a "pamphlet” "flyer” or "handbill.” Dissent at 26-27. We agree that the words of a governing text are a paramount concern, but unlike the dissent, we consider the whole text and give effect to. every word therein. Int’l Ass'n of Machinists & Aerospace Workers v. BF Goodrich Aerospace Aerostructures Group, 387 F.3d 1046, 1051 (9th Cir.2004) ("[i]n analyzing a statutory text, we do not look at its words in isolation.”); In re Cervantes, 219 F.3d 955, 961 (9th Cir.2000) ("[w]e have consistently ... rejected] interpretations that would render a statutory provision ... a nullity”). Here, § 1.218(a)(9) prohibits individuals from distributing written materials, and it prohibits “displaying of placards or posting of materials on bulletin boards or elsewhere on property.” See, e.g., Webster’s II New Riverside University Dictionary 388, 918 (describing display as "[t]o put forth for viewing: EXHIBIT” and post as "[to] put up (an announcement) in a place of public view.”) So, even though Rosebrock did not distribute written materials, § 1.218(a)(9) still applies because he “displayed” and "posted” "materials” — including various flags and banners — on the VAGLA’s property.

.Rosebrock points out that the district court’s order was not clear as to whether both grounds for its decision — mootness, and the appropriateness of permanent injunctive relief — applied to both requests for injunctive relief. He reads the district court’s order as denying the preventive injunction based on mootness and denying the reparative injunction on the merits. We disagree with Rose-brock’s reading of the district court's order. Nothing in the order suggests that the mootness analysis was limited to the request for a preventive injunction. Because we agree with the district court that Rosebrock’s requests for both types of injunctive relief are moot, we need not reach the merits of the requests, and thus we need not comment on the district court's consideration of the merits.

. The defendants did not appeal the summary judgment against them with respect to Rose-brock's request for declaratory relief, so we need not consider the district court’s holding with regard to viewpoint discrimination.

. We have jurisdiction pursuant to 28 U.S.C. § 1291. We review the district court’s mootness determination de novo. Smith v. Univ. of Wash., Law Sch., 233 F.3d 1188, 1193 (9th Cir.2000). Factual determinations underlying the district court’s mootness determination are reviewed for clear error. Wolfson v. Brammer, 616 F.3d 1045, 1053 (9th Cir.2010).

. The dissent argues this case is more like Bell than White because the policy change in Bell, like the recommitment to the regulation here, " 'could be easily abandoned or altered in the future.’ ” Dissent at 976 (quoting Bell, 709 F.3d at 900-01). The dissent also argues that this case differs from White because the policy change here prohibited expressive activity, whereas the permanent policy change *972 in White protected First Amendment rights. Dissent at 977.
The comparison to Bell is flawed. The plaintiff there challenged an ordinance that criminalized sleeping in public, and the Government argued the claim was moot because the Chief of Police issued a Special Order that prohibited law enforcement from enforcing the ordinance under certain circumstances. 709 F.3d at 893-95. But the Special Order could not repeal the ordinance. The ordinance remained in effect, so law enforcement could have legally enforced the ordinance after Plaintiff Bell’s case was dismissed. By contrast, here, there is no issue with the established law, and the goal is for VAGLA police to enforce the law as they should have been doing all along. In other words, the goal is following the law as written, whereas in Bell the officers were instructed not to follow the law under poorly defined circumstances.
Further, the policy change here is substantially similar to the change in White. There, a high-ranking official issued a memorandum that addressed problematic Government conduct and instructed them about First Amendment concerns related to an already-existing law. 227 F.3d at 1243. Here, the associate director’s e-mail resolves the conduct that harmed Rosebrock because the message instructed officers to apply the existing regulation consistently, so as to avoid content-based discrimination. Further, like the memorandum in White, id. at 1242, the e-mail emphasized the importance of First Amendment rights: “protests and/or demonstrations ... that take place off VA Property ... should not be interfered with.” In this situation, the associate director could not have done anything more to trumpet the superiority of the Constitution. After all, she could not legally encourage First Amendment activity on VAG-LA’s property that would violate 38 C.F.R. § 1.218(a)(9).

. We emphasize that the considerations discussed here do not provide an exhaustive or definitive list.

. Rosebrock contends that the discretion allowed to the “head of the facility or designee” under § 1.218(a)(9) to authorize displays on VA property prevents the e-mail from mooting his request for permanent injunctive relief. But there is no evidence in the record suggesting that the head of the LA Campus or any designee will use this discretion to commit viewpoint discrimination now that VAG-LA has recommitted to strict enforcement of the prohibition in § 1.218. Especially in light of the fact that VAGLA's general policy has never been inconsistent enforcement, and in light of the faith we place in the Government, *974 see Am. Cargo Transp., 625 F.3d at 1179-80, we do not take the June 30, 2010 e-mail as a cagy recommitment to strict enforcement of a regulation made with the knowledge that the discretion afforded by the regulation will serve as a loophole allowing ongoing viewpoint discrimination through inconsistent enforcement.