Jamal TARHUNI, Plaintiff,

v.

Loretta LYNCH, in her official capacity as Attorney General of the United States; Federal Bureau of Investigation; James B. Comey, in his official capacity as Director of the Federal Bureau of Investigation; FBI Terrorism Screening Center; Christopher M. Piehota, in his official capacity as Director of the FBI Terrorism Screening Center, Defendants.

No. 3:13–cv–00001–BR.

United States District Court, D. Oregon.

Signed Sept. 8, 2015.

Steven Goldberg, Portland, OR, Thomas H. Nelson, Welches, OR, for Plaintiff.

Brigham J. Bowen, Trial Attorney, Adam D. Kirschner, United States Department of Justice, Civil Division, Federal Programs Branch, Washington, DC, for Defendants Loretta Lynch, Federal Bureau of Investigation, James B. Corney, FBI Terrorism Screening Center, and Christopher M. Piehota.

## OPINION AND ORDER

BROWN, District Judge.

This matter comes before the Court on Defendants' Motion (# 92) to Dismiss for Lack of Jurisdiction. The Court heard oral argument on June 25, 2015.

Through the course of litigating this Motion, the parties have relied extensively on factual developments that are not included in Plaintiff's Third Amended. Complaint (# 53). Accordingly, on August 18, 2015, the Court **CONVERTED** Defendants' Motion (# 92) to Dismiss for Lack of Jurisdiction into a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 12(d) and provided the parties with an opportunity to submit no later than September 1, 2015, additional materials appropriate for summary-judgment motions.

For the reasons that follow, the Court **GRANTS** Defendants' Motion and **DISMISSES** this matter with prejudice.

## FACTUAL BACKGROUND

The following facts are undisputed:

### I. The No–Fly List

Defendant Federal Bureau of Investigation (FBI), through Defendant Terrorism Screening Center (TSC), is responsible for development and maintenance of the No–Fly List (List), which consists of the names of individuals whom airlines serving or flying within the United States may not transport. Most individuals on the List, including Plaintiff, are prohibited from flying into, out of, or over Canadian airspace as well as American airspace.

The No–Fly List is a subset of the Terrorist Screening Database (TSDB), which is a consolidated terrorist watchlist maintained by the TSC that contains sensitive but unclassified identifying information about those in the TSDB. The TSDB itself does not contain any substantive derogatory intelligence information or classified national-security information. Nominations to the TSDB are made by various law-enforcement- and national-security agencies. Nominations to the TSDB must contain sufficient information to satisfy "mini-

mum identifying criteria to allow screeners to be able to discern a match, and minimum substantive derogatory criteria to establish a reasonable suspicion that the individual is a known or suspected terrorist." Decl. of Steven Goldberg (# 105), Ex. A at ¶ 15. The TSC, through the TSDB, provides terrorist identity information to various law-enforcement and screening agencies and entities.

Nominations of an individual to be placed on the No–Fly List are evaluated by the TSC to determine whether the derogatory information provided by the nominating agency establishes a reasonable suspicion that the individual meets additional heightened derogatory criteria that goes above and beyond the criteria required for inclusion in the broader TSDB. An individual may be included on the No–Fly List if the individual poses:

(1) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) or domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to an aircraft (including a threat of piracy, or a threat to airline, passenger, or civil aviation security);

(2) a threat of committing an act of domestic terrorism (as defined in 18 U.S.C. § 2331(5)) with respect to the homeland;

(3) a threat of committing an act of international terrorism (as defined in 18 U.S.C. § 2331(1)) against any U.S. Government facility abroad and associated or supporting personnel, including U.S. embassies, consulates and missions, military installations (as defined by 10 U.S.C. § 2801(c)(4)), U.S. ships, U.S. aircraft, or other auxiliary craft owned or leased by the U.S. Government; or

(4) a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so.

Goldberg Decl., Ex, A at ¶ 17.

Under procedures in place at the time that Plaintiff initiated this matter, individuals placed on the List (including Plaintiff) were not given notice that they were on the List, were not advised of the factual basis for placement on the List, and did not have the right to a hearing before a neutral decision-maker to challenge their placement on the List.

Individuals who wished to challenge their placement on the List could submit an inquiry to the Department of Homeland Security Traveler Redress Inquiry Program (DHS TRIP) together with any information that the individual believed could be relevant to his placement on the List. DHS TRIP then transmitted the inquiry to the TSC, which determined whether any action should be taken. Subject to judicial review, TSC was the final arbiter of whether an individual was removed from the List.

## II. *Plaintiff's Inclusion on the No–Fly List*

Plaintiff, an American citizen of Libyan descent, has lived in the United States for 41 years, became a United States citizen In 2006, and is a resident of Oregon. Plaintiff is married with four children.

Since the 1980s Plaintiff has considered himself an opponent of Muammar Gaddafi's regime in Libya. In the wake of the revolution in Libya overthrowing the Gaddafi regime, Plaintiff traveled to Libya three times in 2011 and early 2012 as a volunteer with Medical Teams International (MTI), a nongovernmental organization based in Tigard, Oregon, While in Libya Plaintiff provided cultural, language, and logistical assistance to MTI by helping deliver medicine, medical equipment, and supplies to Libya. During these trips Plaintiff often worked with Libyan and Tunisian government and humanitarian organizations. Throughout his time in Libya Plaintiff facilitated the clearance of shipping containers of medical supplies

through customs; ordered the shipment of additional containers of medical supplies requested by personnel working at hospitals like the Benghazi Medical Center, Al Jala Hospital, and Al Hawray Hospital; and coordinated travel of nurses from the United States to Benghazi, Libya. Plaintiff facilitated the delivery of supplies through Tunisia and Egypt and visited refugee camps in Tataouine, Remada, and Dahiba, Tunisia, with the help of the Tunisian Red Crescent. Security for Plaintiff's travels in Libya was provided by fighters opposed to the Gaddafi regime.

Near the end of his third and final trip to Libya with MTI, Plaintiff arranged to return to Portland on January 17, 2012. Although he previously did not have any difficulty flying between Tunisia or Egypt and the United States, Plaintiff was denied boarding on his plane on January 17, 2012.

After learning he was on the No–Fly List, Plaintiff contacted the United States Embassy in Tunis, Tunisia. Embassy personnel asked Plaintiff to come to the Embassy in Tunis on January 24, 2012, to meet with undisclosed United States agency personnel.

On January 24, 2012, Plaintiff arrived at the American Embassy in Tunis with a Tunisian attorney and was met by Brian Zinn, an FBI Agent from Portland, Oregon, and another individual who was the head of Embassy Security. Agent Zinn escorted Plaintiff to an interview room in which another FBI agent, Horace Thomas, was also present. Agent Zinn advised Plaintiff that he and Thomas were there to discuss his work in Libya.

In the presence of Plaintiff's Tunisian attorney, Agent Zinn interviewed Plaintiff for 3½ hours as to his activities in Libya; the names of people he worked with; his views on terrorist organizations; whether he had contacts with any terrorist, mujahi-

deen, or Islamist groups; whether he had knowledge of any planned attack on the United States or its allies; and his religious view's and practices.

During a break in the interview Agent Zinn told Plaintiff that he would be permitted to return to the United States if he passed a polygraph test. Plaintiff agreed to take the test. When another FBI agent asked Plaintiff to waive his constitutional rights before taking the test, however, Plaintiff refused after consulting with his American attorney, and the interview was ended.

On February 13, 2012, Plaintiff returned to the United States by air after making arrangements to do so with United States personnel at the Embassy in Tunis and Plaintiff's American counsel. Plaintiff, however, remained on the No–Fly List and remained unable to board a commercial aircraft after his return to the United States.

Plaintiff submitted a DHS TRIP inquiry seeking review of his placement on the No–Fly List. Consistent with procedures in place at that time, Plaintiff received a letter from DHS TRIP on July 25, 2013, advising him that DHS " 'conducted a review of any applicable records in consultation with other federal agencies, as appropriate. It has been determined that no changes or conditions are warranted at this time.' " In the July 25, 2013, letter DHS TRIP advised Plaintiff of his right to request an administrative appeal, but the letter did not provide any Information as to the basis for Plaintiff's inclusion on the List.

### III. *Defendants' Revision of DHS TRIP Procedures*

On June 24, 2014, during the pendency of this matter, this Court held in *Latif v. Holder* that Defendants'[1] prior DHS

---

1. Defendants in this case are also defendants in *Latif v. Holder.*

TRIP procedures were constitutionally insufficient. 28 F.Supp.3d 1134 (2014). As a result of the Court's Opinion and Order in *Latif,* Defendants revised DHS TRIP procedures as follows:

If an individual is not allowed to board a commercial flight, that individual may submit an inquiry to DHS TRIP. If DHS TRIP verifies that individual is on the No-Fly List, then DHS TRIP will send a letter to the individual notifying him of his status on the List and providing the individual with the option to receive and/or to submit additional information. If the traveler elects to receive additional information, DHS TRIP will provide a second letter with additional information that includes the specific criteria under which the individual has been placed on the List and, to the extent feasible in light of national-security and law-enforcement interests, an unclassified summary of the information that supports the individual's placement on the No-Fly List. The amount of information provided to the individual will vary on a case-by-case basis. DHS TRIP will not provide an unclassified summary of the reasons for placement on the No-Fly List if the national-security and law-enforcement interests at stake make doing so impossible.

The second letter sent by DHS TRIP will include an invitation for the individual to submit written responses including exhibits or other materials that the individual deems relevant. The Administrator of the Transportation Security Administration (TSA) or his designee will review the individual's submission together with all information that the government relies on to maintain the individual's placement on the No-Fly List. TSA will then provide the individual with a final written determination including the basis for the decision (to the extent feasible in light of the national-security and law-enforcement interests at

stake) and will notify the individual of his ability to seek further judicial review.

## IV. *Defendants' Reconsideration of Plaintiff's DHS TRIP Inquiry*

Following the Court's ruling in *Latif,* the Court ordered Defendants in this case by Case–Management Order (# 79) issued October 3, 2014, to reconsider Plaintiff's DHS TRIP inquiry under the newly-promulgated procedures.

By letter dated November 24, 2014, Defendants notified Plaintiff that he remained on the No-Fly List because Defendants identified Plaintiff as an "individual who 'may be a threat to civil aviation or national security'" and specifically noted Plaintiff is "an individual who represents a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so." As to the unclassified summary of reasons for Plaintiff's placement on the No-Fly List, Defendants informed Plaintiff that "[t]he Government has concerns about the nature and purpose of Jamal Tarhuni's travel to Libya in 2011 and 2012." The letter invited Plaintiff to provide any responsive information no later than December 15, 2014.

After obtaining an extension of the deadline to submit responsive materials, Plaintiff provided a written response to Defendants by letter dated January 23, 2015, regarding their reasons for placing Plaintiff on the No-Fly List. On February 23, 2015, Defendants advised Plaintiff that he had been removed from the No-Fly List "based on the totality of available information, including your submissions to DHS TRIP."

## V. *Plaintiff's Claims for Relief*

Plaintiff asserts two claims for relief against Defendants.

In Claim One Plaintiff brings a substantive due-process claim against Defendants in which he alleges Defendants infringed Plaintiff's fundamental liberty interest in international travel by placing him on the No–Fly List despite the fact that "Plaintiff presents absolutely no security threat to commercial aviation or to his country in any manner." Plaintiff seeks an injunction against all Defendants requiring Plaintiff's immediate removal from the No–Fly List and a declaration that the following acts have violated Plaintiff's substantive due-process rights:

> Defendants [*sic*] placement of plaintiff on the No Fly List, reliance on plaintiff's placement on the List while outside of the U.S. to bar his return to the U.S., and use of plaintiff's presence on the List to require him to participate in an interrogation which could result in him making incriminating statements without the effective assistance of counsel in order to be removed from the List.

Third Am. Compl. at 16.

In Claim Two Plaintiff brings a procedural due-process claim against Defendants in which Plaintiff alleges Defendants deprived him of his protected liberty interest in international travel without affording him adequate post-deprivation notice and the opportunity to be heard. Plaintiff seeks an injunction requiring

> a post-deprivation legal mechanism be established that affords plaintiff notice of his placement on the No Fly List, the reason for his placement on the No Fly List and evidence supporting his inclusion on the List, and a meaningful and timely hearing in which he can challenge his continued inclusion on the List with an independent decision-maker.

Third Am. Compl. at 17. In addition, Plaintiff seeks a declaration that Defendants'

> placement of plaintiff on the No Fly List without informing him of such placement, of the reason or basis for his inclusion on the List, and without providing plaintiff a meaningful and timely opportunity to challenge his continued inclusion on the List, including the provision of an independent forum in which plaintiff might secure the removal of his name from the List

violated Plaintiff's procedural due-process rights. Third Am. Compl. at 16.

## STANDARDS

Summary judgment is appropriate when there is not a "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Washington Mut. Ins. v. United States*, 636 F.3d 1207, 1216 (9th Cir.2011). *See also* Fed. R.Civ.P. 56(a). The moving party must show the absence of a dispute as to a material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir.2005). In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a genuine dispute as to a material fact for trial. *Id.* "This burden is not a light one.... The non-moving party must do more than show there is some 'metaphysical doubt' as to the material facts at issue." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir.2010) (citation omitted).

A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court must draw all reasonable inferences in favor of the nonmoving party. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir.2010). "Summary judgment cannot be granted where contrary inferences may be drawn from

the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir.2004) (citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936*, 680 F.2d 594, 598 (9th Cir.1982)).

A "mere disagreement or bald assertion" that a genuine dispute as to a material fact exists "will not preclude the grant of summary judgment." *Deering v. Lassen Cmty. Coll. Dist.*, No. 2:07–CV–1521–JAM–DAD, 2011 WL 202797, at *2 (E.D.Cal., Jan. 20, 2011) (citing *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989)). *See also Moore v. Potter*, 701 F.Supp.2d 1171 (D.Or.2010). When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir.2009) (citing *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir.1998)).

The substantive law governing a claim or a defense determines whether a fact is material. *Miller v. Glenn Miller Prod., Inc.*, 454 F.3d 975, 987 (9th Cir.2006). If the resolution of a factual dispute would not affect the outcome of the claim, the court may grant summary judgment. *Id.*

## DISCUSSION

Defendants move for summary judgment on Plaintiff's Claims One and Two on the basis that Plaintiff's removal from the No–Fly List has deprived Plaintiff of standing to seek injunctive relief based on his placement on the No–Fly List, and, therefore, this action is moot.

In his Memorandum (# 94) in Opposition to Defendants' Motion to Dismiss, Plaintiff abandons Claim One (substantive due process) as to injunctive relief and all of Claim Two (procedural due process). Accordingly, Plaintiff's sole contention is that Claim One for declaratory relief remains justiciable notwithstanding his recent removal from the No–Fly List.

Although the doctrines of standing and mootness are related, the doctrine of mootness applies in this instance because the events that allegedly mooted Plaintiff's claims occurred during the pendency of these proceedings. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 189–92, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). *See also Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 785 (9th Cir.2006).

## I. Mootness Standard

■■■ "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike Inc.*, —— U.S. ——, 133 S.Ct. 721, 726, 184 L.Ed.2d 553 (2013) (quoting *Murphy v. Hunt*, 455 U.S. 478, 481, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1982)). "No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute 'is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.'" *Already*, 133 S.Ct. at 727 (quoting *Alvarez v. Smith*, 558 U.S. 87, 93, 130 S.Ct. 576, 175 L.Ed.2d 447 (2009)). " 'A case becomes moot whenever it loses its character as a present, live controversy.... The question is not whether the precise relief sought at the time [the case] was filed is still available. The question is whether there can be any effective relief.' " *McCormack v. Herzog*, 788 F.3d 1017, 1024 (9th Cir.2015) (quoting *Siskiyou Reg'l Educ. Project v. U.S. Forest Serv.*, 565 F.3d 545, 559 (9th Cir.2009) (ellipses and bracketed text in original)).

■■■ "The voluntary cessation of challenged conduct does not ordinarily render

a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed." *Knox v. Serv. Emp. Int'l Union, Local 1000,* —— U.S. ——, 132 S.Ct. 2277, 2287, 183 L.Ed.2d 281 (2012). *See also Bell v. City of Boise,* 709 F.3d 890, 898 (9th Cir.2013). "[V]oluntary cessation can yield mootness if a 'stringent' standard is met: 'A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Rosebrock v. Mathis,* 745 F.3d 963, 971 (9th Cir.2014) (quoting *Laidlaw Envtl. Servs.,* 528 U.S. at 189, 120 S.Ct. 693). *See also McCormack,* 788 F.3d at 1024.

When the government changes a policy, the court must presume the government entity is acting in good faith. *Rosebrock,* 745 F.3d at 971. Nonetheless, "when the Government asserts mootness based on such a change it still must bear the heavy burden of showing that the challenged conduct cannot reasonably be expected to start up again." *Id. See also Bell,* 709 F.3d at 898–99. "A presumption of good faith, however, cannot overcome a court's wariness of applying mootness under 'protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption.'" *McCormack,* 788 F.3d at 1025 (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 632 n. 5, 73 S.Ct. 894, 97 L.Ed. 1303 (1953)).

"[W]hile a statutory change 'is usually enough to render a case moot,' an executive action that is not governed by any clear or codified procedures cannot moot a claim." *Id.* (quoting *Bell,* 709 F.3d at 898–900). When determining whether an executive action "not reflected in statutory changes or even in changes in ordinances or regulations" is sufficiently definitive to render a case moot, the court considers the following factors: (1) wheth-

er "the policy change is evidenced by language that is 'broad in scope and unequivocal in tone,'" (2) whether "the policy change fully 'addresses all of the objectionable measures that [the Government] officials took against the plaintiffs in th[e] case,'" (3) whether the case in question was the "'catalyst for the agency's adoption of the new policy,'" (4) whether "the policy has been in place for a long time when we consider mootness," and (5) whether the government has engaged in similar conduct to that challenged by the plaintiff since the implementation of the new policy. *Rosebrock,* 745 F.3d at 972 (quoting *White v. Lee,* 227 F.3d 1214, 1243–44 (9th Cir.2000) (bracketed text in original)). "On the other hand, [the court is] less inclined to find mootness where the 'new policy . . . could be easily abandoned or altered in the future.'" *Rosebrock,* 745 F.3d at 972 (quoting *Bell,* 709 F.3d at 901).

## II. Analysis

Defendants contend their removal of Plaintiff from the No–Fly List moots this matter pursuant to *Rosebrock.* Defendants note their disclosure on the record that Plaintiff had been removed from the No–Fly List was significantly more public and definitive than the intra-agency email in *Rosebrock* in which defendants announced a change in the challenged policy and which the *Rosebrock* court found sufficient to moot that case. *See Rosebrock,* 745 F.3d at 972–74.

Plaintiff, on the other hand, contends there is nothing to stop Defendants from placing him back on the No–Fly List after termination of this litigation, and, in any event, Plaintiff still does not know the specific reasons for his placement on the No–Fly List. Plaintiff also contends he retains a justiciable claims because he intends to return to Libya to visit family and conduct humanitarian work. Without

knowing specifically why he was placed on the No–Fly List, Plaintiff asserts he may be put on the List as a result of future travels. Accordingly, Plaintiff contends this case is not moot, and, therefore, he may proceed with his Claim One for a declaratory judgment.

The Court concludes the voluntary-cessation doctrine does not apply here because Defendants' reconsideration of Plaintiff's DHS TRIP inquiry was not a voluntary act in any real sense. Although Defendants filed a Motion (# 65) to Remand Case to Agency in which they sought to delay these proceedings until they could reconsider Plaintiff's DHS TRIP application under newly-crafted procedures, that Motion was a direct response to this Court's order in *Latif* in which the Court held the same procedures under which Defendants handled Plaintiff's DHS TRIP inquiry in this case were unconstitutional. In other words, Defendants' decision in this case to abandon their original position and to seek leave to reconsider Plaintiff's DHS TRIP application under their newly-crafted procedures was a direct response to the Court's order in *Latif*, an order that would also have been issued in this case if Defendants had continued to litigate Plaintiff's procedural due-process claim. As noted, based on the Court's decision in *Latif* the Court issued a Case-Management Order (# 79) in this case on October 3, 2014, in which it provided the direct judicial imprimatur for Defendants' reconsideration of Plaintiff's DHS TRIP inquiry.[2]

During the course of their reconsideration and after reviewing information submitted by Plaintiff pursuant to the procedures promulgated after the Court's decision in *Latif*, Defendants determined Plaintiff did not meet the criteria to be included on the No–Fly List. Although Defendants certainly exercised their judgment when they determined whether Plaintiff met the criteria for placement on the No–Fly List, that judgment was tempered by the bounds of the Court's order in *Latif* with respect to the procedures that Defendants were required to follow during reconsideration and the substantive criteria for placement on the No–Fly List. Unlike more typical voluntary-cessation cases, when Defendants removed Plaintiff from the No–Fly List they were not exercising broad discretion as is the case when the government chooses on its own to change a policy or a private party elects to alter its behavior. On this record, therefore, the Court concludes the voluntary-cessation doctrine does not apply.

■ As noted, the only remedy Plaintiff seeks at this stage of the proceedings is a declaration that Plaintiff's placement on the No–Fly List violated his substantive due-process rights. Such a declaration, however, would not have any effect on Plaintiff's substantive legal rights because Plaintiff is no longer on the No–Fly List. Instead the declaration that Plaintiff seeks would only serve to provide Plaintiff with the satisfaction of knowing that Defendants' original placement of Plaintiff on the No–Fly List was unlawful. In other words, there is not any effective relief that this Court can provide to Plaintiff that will affect Plaintiff's current legal rights. Accordingly, this case is moot because "the dispute 'is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.'" *See Already, LLC*, 133 S.Ct. at 727.

2. The Court does not express any opinion as to the constitutional sufficiency of Defendants' new DHS TRIP procedures.

Even · if the voluntary-cessation doctrine applied to ·this case, Defendants have carried their "heavy burden" to demonstrate Plaintiff's placement on the No–Fly List based on current information will not recur. *See Rosebrock,* 745 F.3d at 971. Defendants have .twice stated on the public record that Plaintiff is no longer on the No–Fly List and will not be placed on the List based on the. government's current information. As noted, Defendants informed Plaintiff in a letter dated February 23, 2015, that was filed in the record that he was no longer on the No–Fly List "based on the totality of available information, including your submissions to DHS TRIP." Joint Status Rept. (# 89), Ex. 2. Moreover, during the pendency of this Motion and in response to questions from the Court, Defendants also filed the Declaration (# 99) of G. Clayton Grigg, Deputy Director of Operations at the TSC, in which he stated: "Mr. Tarhuni will not be placed back on the No Fly List based on the currently available information."

Although the *Rosebrock* factors do not fit neatly within the context of an individualized determination (as opposed to a general change in policy), the Court concludes the principles expressed in *Rosebrock* support a finding that this case is now moot. Defendants' statements regarding Plaintiff's presence on the No–Fly List and the prospect of his being placed back on the No–Fly List are unequivocal. Moreover, in the more than six months since Plaintiff's removal from the No–Fly List, Defendants have acted in a manner consistent with a genuine change in Defendants' assessment of Plaintiff's inclusion on the List.

Unlike in *McCormack,* there is not any evidence in this · record from which the Court can conclude Defendants' " 'abandonment seems timed to anticipate suit, and there is probability of resumption.' " *See McCormack,* 788 F.3d at 1025 (quoting *W.T. Grant Co.,* 345 U.S. at 632 n. 5, 73 S.Ct. 894). To the contrary, the notion that the government would remove from the No–Fly List an individual whom Defendants believe is, in fact, "an individual who represents a threat of engaging in or conducting a violent act of terrorism and who is operationally capable of doing so" for the mere purpose of concluding this litigation is, to say the least, far-fetched.

Finally, although the Court notes Defendants' assurances regarding Plaintiff's placement on the No–Fly List do not foreclose the possibility that Plaintiff may again be placed on the List if new information became available in the future, such a conjectural possibility cannot form the basis for this Court to retain subject-matter jurisdiction over this case.[3] If Plaintiff is placed on the No–Fly List in the future, the .courthouse door will again be open to him at that time.

Accordingly, on this · record the Court concludes Plaintiff's claims are moot and must be dismissed with prejudice.

## *CONCLUSION*

For these reasons ·the Court **GRANTS** Defendants' Motion (# 92) to Dismiss for Lack of Jurisdiction and **DISMISSES** this matter **with prejudice.**

IT IS SO ORDERED.

---

**3.** In the Declaration of Steven Goldberg (# 105) submitted in response to this Court's conversion of this Motion to a motion for summary judgment, Plaintiff requests this Court allow further discovery even if the Court finds this case not justiciable. On the record before the Court, however, there is not any reason to believe further discovery would affect the justiciability issues that mandate dismissal of this action at this time.