**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

COURTHOUSE NEWS SERVICE,
*Plaintiff-Appellee/
Cross-Appellant*,

v.

MICHAEL D. PLANET, in his official
capacity as Court Executive
Officer/Clerk of the Ventura
County Superior Court,
*Defendant-Appellant/
Cross-Appellee.*

Nos. 16-55977
16-56714

D.C. No.
2:11-cv-08083-
SJO-FFM

OPINION

Appeal from the United States District Court
for the Central District of California
S. James Otero, District Judge, Presiding

Argued and Submitted June 28, 2018
Pasadena, California

Filed January 17, 2020

Before: Kim McLane Wardlaw, N. Randy Smith,
and Mary H. Murguia, Circuit Judges.

Opinion by Judge Wardlaw;
Concurrence by Judge N.R. Smith

# SUMMARY[*]

## Civil Rights

The panel affirmed in part, and reversed in part, the district court's summary judgment in favor of the Courthouse New Service in its action seeking immediate access to newly filed civil complaints from Ventura County Superior Court.

Prior to 2014, Ventura County had a "no-access-before-process" policy pertaining to new civil complaints which often resulted in significant delays between the filing of a complaint and its availability to Courthouse News Service. After this suit was filed, the County dropped the no-access-before-process policy and instituted a "scanning policy," which requires court staff to scan new civil complaints before reviewing or processing them. After scanning, the complaints are available on public computer terminals in the Ventura County clerk's office. Prior to July 2016, complaints filed after 3:00 PM were scanned and made publicly available the next day. The district court concluded that both Ventura County's no-access-before-process policy and its scanning policy unconstitutionally infringed Courthouse News Service's right to timely access the complaints.

Applying *Press-Enterprise Co. v. Superior Court* (*Press-Enterprise II*), 478 U.S. 1 (1986), the panel held that the press has a qualified right of timely access to newly filed

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

civil nonconfidential complaints that attaches when the complaint is filed. However, this right does not entitle the press to immediate access to those complaints. Some reasonable restrictions resembling time, place, and manner regulations that result in incidental delays in access are constitutionally permitted where they are content-neutral, narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice.

The panel held that although Ventura County has a substantial interest in the orderly administration and processing of new complaints, its former no-access-before-process policy failed, under a rigorous but not strict scrutiny analysis, both prongs of the balancing test set forth in *Press-Enterprise II*. Thus, Ventura County had not shown a "substantial probability" that more contemporaneous access to the newly filed complaints would impair its interest in orderly administration. In fact, the record demonstrated that the lengthy delays under the no-access-before-process policy were entirely unrelated to Ventura County's asserted governmental interests. Moreover, the policy caused far greater delays than were necessary to adequately protect Ventura County's administrative interests given the reasonable alternatives available. The panel affirmed the district court's summary judgment as to the no-access-before process policy.

The panel held that Ventura County's scanning policy passed constitutional scrutiny. The panel determined that there was a substantial probability that Ventura County's interest in the fair and orderly administration of new judicial filings would be impaired if the scanning policy was not in place. Moreover, unlike with the no-access-before-process policy, there was nothing in the record to indicate that

Ventura County considered but rejected reasonable alternatives to the scanning policy. Additionally, the panel noted that prior to 2014, Ventura County was undergoing severe budget constraints, and it had demonstrated that the overnight delay in access to complaints filed during the last ninety minutes of the court's public hours was no greater than essential to manage necessary court operations under the circumstances existing at the time. The panel therefore reversed the district court's grant of summary judgment as to the scanning policy, vacated the district court's injunction and award of fees, and remanded for further consideration consistent with the panel's opinion.

Concurring as to part III of the opinion, Judge N.R. Smith stated that the majority correctly determined that Ventura County's access policies resembled time, place, and manner restrictions—they were content-neutral and affected only the timing of access to the newly filed complaints. However, Judge N.R. Smith stated that rather than adopt the time, place, and manner test, the majority applied a strict scrutiny analysis which Supreme Court precedent does not require.

## COUNSEL

Robert A. Naeve (argued), Craig E. Stewart, Erica L. Reilley, and Jaclyn B. Stahl, Jones Day, Irvine, California; Frederick B. Hayes, Hayes Law Office, Hermosa Beach, California; for Defendant-Appellant/Cross-Appellee.

Rachel Matteo-Boehm (argued), Roger Myers, Jonathan Fetterly, and Leila Knox, Bryan Cave LLP, San Francisco, California, for Plaintiff-Appellee/Cross-Appellant.

Caitlin Vogus (argued), Bruce D. Brown, and Selina MacLaren, The Reporters Committee for Freedom of the Press, Washington, D.C., for Amicus Curiae The Reporters Committee for Freedom of the Press.

John C. Eastman, Center for Constitutional Jurisprudence, Chapman University Fowler School of Law, Orange, California; Keith R. Fisher, National Center for State Courts, Arlington, Virginia; for Amicus Curiae Conference of Chief Justices.

## OPINION

WARDLAW, Circuit Judge:

"The peculiar value of news is in the spreading of it while it is fresh." *Int'l News Serv. v. Associated Press*, 248 U.S. 215, 235 (1918), *abrogated on other grounds by Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). This case pits the urgency of reporting on, and the public interest in obtaining, contemporaneous news about filings in our courts against administrative interests in the fair and orderly processing of those filings. During Courthouse News Service's decade-long battle to obtain immediate access to newly filed complaints from Ventura County Superior Court, the drive for "fresh" news has only become more intense. In this digital age, newsfeeds and media platforms update the news by the minute or even by the second, and even traditional media deliver an endless stream of "breaking" news. Yet courts undeniably have an important administrative function that requires orderly processing of new filings, and this results in incidental delays to access by the press and public. We are asked to resolve these competing interests.

Applying *Press-Enterprise Co. v. Superior Court* (*Press-Enterprise II*), 478 U.S. 1 (1986), we conclude that the press has a qualified right of timely access to newly filed civil nonconfidential complaints that attaches when the complaint is filed.  However, this right does not entitle the press to immediate access to those complaints.  Some reasonable restrictions resembling time, place, and manner regulations that result in incidental delays in access are constitutionally permitted where they are content-neutral, narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice.

## I.

## A.

Courthouse News Service (CNS) "is a national news organization that publishes daily reports for its subscribers about civil litigation, including the filing of new lawsuits." *Courthouse News Serv. v. Planet* (*Planet I*), 750 F.3d 776, 779 (9th Cir. 2014).  CNS has more than 2,700 subscribers nationwide, including lawyers, law firms, news organizations, other media outlets, and entertainment and watchdog groups.  In addition to sending proprietary litigation reports to law firms, CNS counts twenty-nine media entities among its subscribers, including the *Los Angeles Times* and *Boston Globe*.  *Id.* at 780.  CNS describes itself as a "pool reporter" for national media, which disseminate CNS's litigation news to the broader public.

To collect information on newly filed complaints, CNS dispatches its reporters to some 2,600 courthouses across the country, including the Ventura County Superior Court (Ventura County).  Over 250 CNS reporters review newly filed complaints and decide which are newsworthy.  In

California state courts, CNS reports only on unlimited civil complaints, which either seek injunctive relief or have an amount in controversy greater than $25,000.[1] *See id.* at 779 n.1; Cal. Civ. Proc. Code §§ 85(a), 88. Approximately sixty-five entities subscribe to CNS's "Central Coast Reports," the CNS publication that reports on Ventura County lawsuits.

Defendant Michael Planet serves as the Ventura County Court Executive Officer and Clerk. Planet is responsible for the administration of court records, which includes responding to media and other public requests for access to court records. His deputy, Cheryl Kanatzar, is responsible for processing civil court complaints and supervising the Civil Department court processing assistants.

Ventura County neither requires nor allows electronic filing; thus, all pleadings and other documents at the court are filed in paper format and maintained in hard copy in a physical case file in the clerk's office. Between November 2010 and June 2014, the court maintained a "media bin" in which it placed newly filed complaints *after* processing them. During that time, Ventura County processed newly filed complaints at the filing counters or desks in the Civil Department using the Court Case Management System (CCMS), which allows the court to maintain its docket of court filings. Ventura County required a seven-step procedure to process a new civil complaint using CCMS. As the district court described:

---

[1] CNS does not argue that it is entitled to access documents that are statutorily or judicially deemed confidential. Accordingly, our decision here concerns only publicly available civil complaints, i.e., those deemed non-confidential by state law or judicial determination, or those that were not otherwise properly filed under seal.

> First, a [court processing assistant] reviews the documents to determine that the complaint is being filed in the correct court and the documents necessary to initiate the case are presented with the correct filing fee or fee waiver. Second, the [court processing assistant] enters all the required case information to "create" a new case in CCMS. Third, all accompanying instruments, for example checks, are entered and the receipt is generated. Fourth, any summons required are issued. Fifth, the documents are stamped as "Filed." Sixth, the labels generated from CCMS are placed on the physical case file, along with the filing date, courtroom assignment, and case destruction stamp. Finally, the documents are placed in a physical case file.

After court processing assistants completed these steps, supervisors performed an additional layer of quality control review, a process which took several additional days to complete. Only after *both* processes were completed would the clerk designate newly filed civil complaints as "located to the media bin" for public access. However, sometimes the complaints never even made it to the bin, and the court kept no record of the complaints actually delivered to the media bin.

Ventura County also excepted certain complaints from the media bin. After processing, the court routed directly to judges complaints requiring "immediate judicial review," such as California Environmental Quality Act (CEQA) cases or complaints filed simultaneously with ex parte applications for temporary restraining orders. Staff then delivered copies

of only the face pages of these complaints to the media bin. To view the entirety of the complaint, CNS had to request a copy directly from the chambers of the assigned judge.

This "no-access-before-process" policy often resulted in significant delays between the filing of a complaint and its availability to CNS; in many documented periods, over half of the filed complaints took two or more court days to become publicly available. Although Planet acknowledges the delay resulting from the no-access-before-process policy, he justified the policy by asserting concerns about privacy and confidentiality, accounting protocols and check payments attached to complaints, quality control, efficiency, and the integrity of court records.

After this suit was filed, however, Planet dropped the no-access-before-process policy. In June 2014, Ventura County instituted its "scanning policy," which requires court staff to scan new civil complaints before reviewing or processing them. After scanning, the complaints are available on public computer terminals in the Ventura County clerk's office. When Planet originally adopted the scanning policy, the public, including CNS reporters, could view the scanned filings from 8:00 AM until 3:00 PM, even though the courthouse remained open and court staff accepted new filings until 4:30 PM. Complaints filed after 3:00 PM were scanned and made publicly available the next day.

The parties dispute what percentage of new complaints Ventura County made available on the same day as filing under the scanning policy, a dispute that arises from the 3:00 PM public closing time of the clerk's office. Planet maintains that Ventura County provided same-day access to approximately 97% of filings. CNS counters that Ventura County scanned between "one-third and more than one-half" of complaints after 3:00 PM. Ventura County does not

automatically scan and make available any exhibits submitted with the complaints; nor did CNS reporters ask for the exhibits from the court until this litigation.

## B.

CNS filed its original lawsuit seeking same-day access to newly filed civil complaints on September 29, 2011. The district court dismissed the suit under the *Pullman* and *O'Shea* abstention doctrines. *See R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496 (1941); *O'Shea v. Littleton*, 414 U.S. 488 (1974). We reversed the district court's decision to abstain.

Citing *Press-Enterprise II*, we rejected Planet's argument that this is not a free expression case, holding that CNS was asserting its First Amendment right of timely access to judicial and other public proceedings and documents. *Planet I*, 750 F.3d at 784–85. We further held that "*Pullman* abstention 'is generally inappropriate when First Amendment rights are at stake.'" *Id.* at 784 (quoting *Wolfson v. Brammer*, 616 F.3d 1045, 1066 (9th Cir. 2010)). We noted that the first requirement for *Pullman* abstention— that "the case touches on a sensitive area of social policy upon which the federal courts ought not to enter"—"is 'almost never' satisfied in First Amendment cases 'because the guarantee of free expression is always an area of particular federal concern.'" *Id.* at 783–84 (first quoting *Porter v. Jones*, 319 F.3d 483, 492 (9th Cir. 2003); then quoting *Ripplinger v. Collins*, 868 F.2d 1043, 1048 (9th Cir. 1989)). "Abstaining in this case portends particularly egregious damage to First Amendment rights because it stifles the 'free discussion of governmental affairs' that the First Amendment exists to protect." *Id.* at 787 (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 604 (1982)). Moreover, "[t]he purpose of CNS's effort to timely

access filed unlimited civil complaints is to report on whatever newsworthy content they contain, and CNS cannot report on complaints the Ventura County Superior Court withholds." *Id.* at 787–88.

We also rejected the district court's dismissal on *O'Shea* grounds because we disagreed that remedying Ventura County's denial of the First Amendment right to timely access newly filed complaints would necessarily require "an ongoing federal audit." *Id.* at 791 (quoting *E.T. v. Cantil-Sakauye*, 682 F.3d 1121, 1124 (9th Cir. 2012) (per curiam)). We remanded to the district court to determine the merits of CNS's claims, including whether "the right of access may be overcome by an 'overriding [governmental] interest based on findings that closure is essential to preserve higher values and is narrowly tailored to preserve that interest.'" *Id.* at 793 n.9 (alteration in original) (quoting *Leigh v. Salazar*, 677 F.3d 892, 898 (9th Cir. 2012) (quoting *Press-Enterprise II*, 478 U.S. at 8–9)). We also suggested that the "delay in making the complaints available may also be analogous to a permissible 'reasonable restriction [ ] on the time, place, or manner of protected speech.'" *Id.* (alteration in original) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)).

Upon remand, the district court dismissed CNS's (by-then-filed) first amended complaint for failure to state a claim. Erroneously interpreting *Press-Enterprise II* and our mandate, the court ruled on a different issue entirely— whether "filed civil complaints which have not yet been the subject of a hearing are outside the scope of the First Amendment right of access." *Courthouse News Serv. v. Planet* (*Planet II*), 614 F. App'x 912, 915 (9th Cir. 2015). We again reversed and remanded the case for reassignment to a different district court judge. *Id.*

Upon remand from *Planet II*, on cross-motions for summary judgment, the new district court judge granted CNS's motion in part, denied Planet's motion, and entered declaratory relief and a permanent injunction against Ventura County. Although the district court recognized that CNS had a First Amendment right of timely access to newly filed civil complaints, it rejected CNS's claim that Ventura County's failure to provide *same-day* access infringed that right. The district court held, however, that the right of access would be impaired if Ventura County failed to provide *timely* access. The district court further held that the right to timely access attaches at the moment of filing, i.e., when the complaint is received by the court. The district court concluded that both Ventura County's no-access-before-process policy and its scanning policy unconstitutionally infringed CNS's right to timely access the complaints.

Accordingly, the district court permanently enjoined Planet and Ventura County "from refusing to make newly filed unlimited civil complaints and their associated exhibits available to the public and the press until after such complaints and associated exhibits are 'processed,'" and it "further directed [Planet and Ventura County] to make such complaints and exhibits accessible to the public and press in a timely manner from the moment they are received by the court . . . except in those instances where the filing party has properly moved to place the complaint under seal." As a result, Planet changed the court's scanning policy. Under the post-injunction scanning policy, Ventura County now keeps its clerk's office open to the public until 4:00 PM and has moved up its filing deadline to 4:00 PM.

These cross-appeals followed.

**C.**

We have jurisdiction pursuant to 28 U.S.C. § 1291. In First Amendment cases, we review de novo the district court's grant of summary judgment and independently review factual findings. *Kaahumanu v. Hawaii*, 682 F.3d 789, 796 (9th Cir. 2012).

**II.**

We have long presumed a First Amendment "right of access to court proceedings and documents." *Oregonian Publ'g Co. v. U.S. Dist. Court*, 920 F.2d 1462, 1465 (9th Cir. 1990) (citing *Press-Enterprise Co. v. Superior Court* (*Press-Enterprise I*), 464 U.S. 501, 510 (1984)); *accord United States v. Index Newspapers LLC*, 766 F.3d 1072, 1084 (9th Cir. 2014). Concurring in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), Justice Stevens described the Court's holding: "Today . . . the Court unequivocally holds that an arbitrary interference with access to important information is an abridgment of the freedoms of speech and of the press protected by the First Amendment."[2] *Id.* at 583 (Stevens, J., concurring). From there, a full majority of the Court affirmed this presumptive right of access in *Globe Newspaper Co. v. Superior Court*. *See* 457 U.S. at 603–04.

The presumption of access to judicial proceedings flows from an "unbroken, uncontradicted history" rooted in the common law notion that "justice must satisfy the appearance

---

[2] Justice Stevens's concurrence chided the Court for not recognizing earlier that "the First Amendment protects the public and the press from abridgment of their rights of access to information about the operation of their government, including the Judicial Branch." *Id.* at 584; *see also Houchins v. KQED, Inc.*, 438 U.S. 1, 30–38 (1978) (Stevens, J., dissenting).

of justice." *Richmond Newspapers*, 448 U.S. at 573–74 (plurality opinion) (quoting *Levine v. United States*, 362 U.S. 610, 616 (1960)); *see also Ibrahim v. U.S. Dep't of Homeland Sec.*, 912 F.3d 1147, 1184 n.38 (9th Cir. 2019) (en banc) *cert. denied*, 140 S. Ct. 424, 425 (2019) (mem.)). Openness in judicial proceedings "enhances both the basic fairness of the [proceeding] and the appearance of fairness so essential to public confidence in the system," *Press-Enterprise I*, 464 U.S. at 508, and forms "an indispensable predicate to free expression about the workings of government," *Planet I*, 750 F.3d at 785. "The right of access is thus an essential part of the First Amendment's purpose to 'ensure that the individual citizen can effectively participate in and contribute to our republican system of self-government.'" *Id.* (quoting *Globe Newspaper*, 457 U.S. at 604).

The First Amendment right of access exists, moreover, to enable free and informed discussion about important issues of the day and governmental affairs. Thus, "[t]he news media's right of access to judicial proceedings is essential not only to its own free expression, but also to the public's." *Id.* at 786. "With respect to judicial proceedings in particular, the function of the press serves . . . to bring to bear the beneficial effects of public scrutiny upon the administration of justice." *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492 (1975). "The free press is the guardian of the public interest, and the independent judiciary is the guardian of the free press." *Leigh*, 677 F.3d at 900. These values hold especially true where, as here, the impetus for CNS's efforts to obtain newly filed complaints is its interest in timely reporting on their contents. *See Planet I*, 750 F.3d at 787–89; *cf. Richmond Newspapers*, 448 U.S. at 592 (Brennan, J., concurring in the judgment) ("[A] special solicitude for the public character of judicial proceedings is

evident in the Court's rulings upholding the right to report about the administration of justice.").

## A.

We must determine whether the qualified First Amendment right of access applies to the type of judicial record at issue here—newly filed nonconfidential civil complaints—and, relatedly, at what point in time that right attaches. To determine whether a First Amendment right of access attaches to a type of judicial proceeding or record, we consider (1) whether that proceeding or record "ha[s] historically been open to the press and general public" and (2) "whether public access plays a significant positive role in the functioning of the particular [governmental] process in question." *Press-Enterprise II*, 478 U.S. at 8; *see also Index Newspapers*, 766 F.3d at 1084. This "experience and logic" test evaluates the institutional value of public access to judicial proceedings and records to determine whether the First Amendment provides a presumption of access. *See Globe Newspaper*, 457 U.S. at 605. A presumptive First Amendment right of access arises if a proceeding or record satisfies both requirements of the two-part test.

The Supreme Court has yet to explicitly rule on whether the First Amendment right of access to information reaches civil judicial proceedings and records, but the federal courts of appeals widely agree that it does. *Planet I*, 750 F.3d at 786 (collecting cases); *see also Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1069 (7th Cir. 2018), *cert. denied*, 140 S. Ct. 384 (2019) (mem.). Indeed, every circuit to consider the issue has uniformly concluded that the right applies to both civil and criminal proceedings. *See Dhiab v. Trump*, 852 F.3d 1087, 1099 (D.C. Cir. 2017) (Rogers, J., concurring in part and concurring in the judgment)

(collecting cases).**[3]**  This nationwide consensus accords with the broad understanding of First Amendment rights—and the rejection of "any 'narrow, literal conception' of the Amendment's terms,"—that the Supreme Court has long espoused:

> [T]he Framers were concerned with broad principles, and wrote against a background of shared values and practices.  The First Amendment is thus broad enough to encompass those rights that, while not unambiguously enumerated in the very terms of the Amendment, are nonetheless necessary to the enjoyment of other First Amendment rights.

*Globe Newspaper*, 457 U.S. at 604 (quoting *NAACP v. Button*, 371 U.S. 415, 430 (1963)).

---

**[3]** *See Planet I*, 750 F.3d at 786; *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 298 (2d Cir. 2012) (administrative civil infraction hearings); *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253–54 (4th Cir. 1988) (documents filed in connection with summary judgment motion in civil case); *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1070 (3d Cir. 1984) ("A presumption of openness inheres in civil trials as in criminal trials."); *In re Cont'l Ill. Sec. Litig.*, 732 F.2d 1302, 1308 (7th Cir. 1984) (litigation committee reports in shareholder derivative suits); *In re Iowa Freedom of Info. Council*, 724 F.2d 658, 661 (8th Cir. 1983) (contempt proceedings, which are "a hybrid containing both civil and criminal characteristics"); *Newman v. Graddick*, 696 F.2d 796, 801 (11th Cir. 1983) (civil trial and enforcement proceedings concerning "the release or incarceration of prisoners and the conditions of their confinement"); *see also Doe v. Public Citizen*, 749 F.3d 246, 268 (4th Cir. 2014) (docket sheets for civil proceedings).  The California Supreme Court has also so concluded.  *NBC Subsidiary (KNBC-TV), Inc. v. Superior Court*, 980 P.2d 337, 361 (Cal. 1999).

We agree with the Seventh Circuit that although "the First Amendment does not explicitly mention a right of access to court proceedings and documents, 'the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents,'" and that this right extends to civil complaints.[4] *Brown*, 908 F.3d at 1068–70 (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978)). As we held in *Planet I*, and as the district court correctly concluded, a qualified First Amendment right of access extends to timely access to newly filed civil complaints. *Id.* at 788; *see also Planet II*, 614 F. App'x at 915. Though we did not expressly apply the "experience and logic" test in *Planet I*, both our common experience and the logical extension of First Amendment principles lead to the conclusion that "[t]he press's right of access to civil proceedings and documents fits squarely within the First Amendment's protections." *Brown*, 908 F.3d at 1069. Both sides before us agree that experience and logic support a public right of access to newly filed civil complaints. Indeed, Planet represents that Ventura County has a "long-standing policy of providing timely access to court records," and agrees that the First Amendment protects a right of access to new civil

---

[4] We disagree, however, with the Seventh Circuit's decision to abstain from resolving the dispute about when the right attaches and when delays are so long as to be tantamount to a denial of the right. *See Brown*, 908 F.3d at 1070–75; *see also Rizzo v. Goode*, 423 U.S. 362, 378–79 (1976); *O'Shea*, 414 U.S. 488. In *Planet I*, we concluded that the injunctive relief CNS then sought neither presented a risk of an "ongoing federal audit" of a state's judicial system nor amounted to "a major continuing intrusion of the equitable power of the federal courts into the daily conduct of state . . . proceedings." 750 F.3d at 790–92 (quoting *O'Shea*, 414 U.S. at 500, 502). We pointed out that Ventura County would have "available a variety of simple measures" that it could take to comply with an injunction requiring it to provide CNS timely access to newly filed complaints. *Id.* at 791.

complaints.  But he now argues that the right does not arise until judicial action of some sort.  CNS urges us to affirm the district court's conclusion that the First Amendment creates a right of access that arises upon the court's receipt of the complaint.  In CNS's view, anything short of immediate access violates its First Amendment rights.

**B.**

We reject Planet's contention that the right of access to civil complaints attaches only at the moment "they become the subject of some type of judicial action."  Our decision in *Planet II* remains the law of this case.  *See Planet II*, 614 F. App'x at 915; *see also Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc) ("Under the law of the case doctrine, a court will generally refuse to reconsider an issue that has already been decided by the same court or a higher court in the same case." (citing *Jeffries v. Wood*, 114 F.3d 1483, 1488–89 (9th Cir. 1997) (en banc)).  Even if *Planet II* had not foreclosed this argument, no court has held or even suggested that the public character of judicial records depends on whether the proceedings have progressed to a stage requiring a judge to act on the papers.

A complaint is a judicial document or record: an item filed with a court that is "relevant to the judicial function and useful in the judicial process."  *Judicial Document*, Black's Law Dictionary (10th ed. 2014); *accord Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 139 (2d Cir. 2016) (quoting *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006)).  Absent a showing that there is a substantial interest in retaining the private nature of a judicial record, once documents have been filed in judicial proceedings, a presumption arises that the public has the right to know the information they contain. *See Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*,

24 F.3d 893, 897 (7th Cir. 1994). CNS has submitted specific evidence that numerous jurisdictions around the country make newly filed complaints publicly available. The declarations of CNS reporters demonstrate a widespread practice of making complaints available before they are subjected to judicial review. The same is true of the long list of state statutes providing access to judicial records that CNS and Planet each marshal.[5] Even Planet concedes that "[a]t least 34 states obligate records custodians to respond to access requests within a reasonable period of time or a fixed number of days." None of these statutes conditions access on judicial action.

Moreover, public access to civil complaints before judicial action upon them "plays a particularly significant role" in the public's ability to ably scrutinize "the judicial process and the government as a whole." *Globe Newspaper*, 457 U.S. at 606. Citizens could hardly evaluate and participate in robust public discussions about the performance of their court systems if complaints—and, by extension, the very existence of lawsuits—became available only after a judicial decision had been made. As one district court has elaborated:

> [T]he public has a right to know how its resources are being used—courts are funded by the public, judges are evaluated by the public, officials who appoint and approve judges are voted on by the public, and the laws under which parties sue may be refined, rescinded, or strengthened based on the

---

[5] *See e.g.*, Ariz. S. Ct. R. 123(f)(2); Cal. Gov't Code § 68150(l); Fla. Jud. Admin. R. 2.420(m); Idaho Ct. Admin. R. 32(j); Miss. Code. Ann. § 25-61-5; Ohio R. Superintendence 45(b).

> public's views of the ways in which they play
> out in court.

*Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, No. 14-CV-6867 (VEC), 2016 WL 1071107, at *9 (S.D.N.Y. Mar. 18, 2016), *aff'd*, 814 F.3d 132 (2d Cir. 2016); *see also United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995) ("[Monitoring of the courts] is not possible without access to . . . documents that are used in the performance of Article III functions.").

Public access to civil complaints before judicial action also buttresses the institutional integrity of the judiciary. *See Doe v. Public Citizen*, 749 F.3d 246, 266 (4th Cir. 2014); *see also Littlejohn v. Bic Corp.*, 851 F.2d 673, 682 (3d Cir. 1988) ("Public access serves to promote trustworthiness of the judicial process, to curb judicial abuses, and to provide the public with a more complete understanding of the judicial system, including a better perception of its fairness."). Some civil complaints may *never* come up for judicial evaluation because they may prompt the parties to settle. The public still has a right to know that the filing of the complaint in our courts influenced the settlement of the dispute: "When a complaint is filed, and the authority of the people of the United States is thereby invoked, even if only as a threat to induce settlement, the American people have a right to know that the plaintiff has invoked their power to achieve his personal ends." *Bernstein*, 2016 WL 1071107, at *9; *see also Bernstein*, 814 F.3d at 140.

In support of his argument that the public right of access arises only post-judicial action, Planet points to cases that merely conclude that various civil litigation documents fall outside of the First Amendment right of access altogether. *See, e.g.*, *In re Boston Herald, Inc.*, 321 F.3d 174, 176 (1st

Cir. 2003) (documents "submitted by a criminal defendant to show financial eligibility for [Criminal Justice Act] funds"); *Littlejohn*, 851 F.2d at 680 & n.14 (evidentiary document that was "never specifically referred to at trial or admitted into evidence"). These cases address documents that are not in fact part of the record of judicial proceedings, unlike the complaint, "which initiates judicial proceedings, is the cornerstone of every case, the very architecture of the lawsuit," and access to which "is almost always necessary if the public is to understand a court's decision." *Bernstein*, 814 F.3d at 140 (quoting *FTC v. Abbvie Prods. LLC*, 713 F.3d 54, 62 (11th Cir. 2013)).

Planet also argues that then-Judge Scalia's opinion in *In re Reporters Committee for Freedom of the Press*, 773 F.2d 1325 (D.C. Cir. 1985), supports his position that the tradition of access to judicial records does not include "pre-judgment access." *See id.* at 1333. That decision is inapposite, however. *Reporters Committee* concerned the district court's entry of a protective order on discovery materials obtained from third party Mobil Oil Corporation "on the ground that much of it was sensitive and confidential." *Id.* at 1326. The application for the protective order was supported by a declaration "describing in general terms the negative effect release of the materials as a whole would have on Mobil's business in Saudi Arabia and its competitive position in shipping." *Id.* Much of the discovery designated as confidential was filed under seal in pre-trial motions for summary judgment. *Id.* The district court ultimately released all the documents to the group of reporters seeking them following the trial and judgment. *Id.* at 1328. In contrast, the civil complaints at issue here by stipulation are not confidential, subject to a protective order or filed under seal.

And as Judge J. Skelly Wright pointed out, then-Judge Scalia's "unnecessary constitutional ruminations" drawing on late-nineteenth century cases supporting a historical rule of no access to pre-judgment civil records were pure dicta and also not quite an accurate historical portrayal. *Id.* at 1342, 1348 (Wright, J., concurring in part and dissenting in part); *see also id.* at 1333–36 (citing *Ex parte Drawbaugh*, 2 App. D.C. 404 (1894); *Schmedding v. May*, 85 Mich. 1 (1891); and *Cowley v. Pulsifer*, 137 Mass. 392 (1884)). Indeed, the late-nineteenth century cases unearthed in *Reporters Committee* do not foreclose finding a tradition of access here.[6] And a 1953 nationwide study of court practices regarding access to government information concluded otherwise:

> In the preponderant majority of states judicial records are in fact and law open to inspection by citizens and newspapermen as and when the papers become judicial records through being filed or through other procedure. *Inspection does not wait upon proceedings in open court or indeed any judicial action*, that is, action upon them by a judge.

Harold L. Cross, *The People's Right to Know* 151 (1953) (emphasis added).

---

[6] As early as 1927, New York courts rejected the reasoning of the 1884 case *Cowley v. Pulsifer*, 137 Mass. 392 (1884), relied upon by then-Judge Scalia with respect to privilege from libel for reporting on court documents. *See Campbell v. N.Y. Evening Post*, 245 N.Y. 320, 327–28 (1927).

## C.

Though we conclude, as did the district court, that the qualified right of access to nonconfidential civil complaints arises when they are filed with the court, we do not view that conclusion as demanding immediate, pre-processing access to newly filed complaints. At the same time, however, we recognize, like the district court, that a necessary corollary of the right to access is a right to timely access. CNS's reporting on complaints must be timely to be newsworthy and to allow for ample and meaningful public discussion regarding the functioning of our nation's court systems. *See Globe Newspaper*, 457 U.S. at 604–05; *Grove Fresh*, 24 F.3d at 897–98 (7th Cir. 1994). As the Court reasoned in *Bridges v. California*, 314 U.S. 252 (1941), a ban on reporting news "just at the time [the] audience would be most receptive" would be effectively equivalent to "a deliberate statutory scheme of censorship." *Id.* at 269. In other words, the public interest in obtaining news is an interest in obtaining contemporaneous news. *In re Reporters Comm.*, 773 F.2d at 1352–53 (Wright, J., concurring in part and dissenting in part). As the Seventh Circuit explained in *Grove Fresh*: "The newsworthiness of a particular story is often fleeting. To delay or postpone disclosure undermines the benefit of public scrutiny and may have the same result as complete suppression." 24 F.3d at 897. Before us, amici the Reporters Committee for Freedom of the Press and twenty-seven media organizations[7] press the point that

---

[7] The media organizations include: American Society of News Editors, The Associated Press, Association of Alternative Newsmedia, The Center for Investigative Reporting, Dow Jones & Company, Inc., The E.W. Scripps Company, First Amendment Coalition, Gannett Co., Inc., Hearst Corporation, International Documentary Association, Investigative Reporting Workshop at American University, Los Angeles Times Communications LLC, The McClatchy Company, MediaNews

"news" is not even "news" if it is not timely, that is, immediate and contemporaneous. *See* Janet Kolodzy, *Convergence Journalism* 59 (2006) ("It is, after all, called the 'news' business and not the 'olds' business."); Fred Fedler et al., *Reporting for the Media* 123 (8th ed. 2005) (identifying timeliness as a central characteristic of news). Thus, that "old" news is not worthy of, and does not receive, much public attention has been widely recognized. Moreover, as amici argue, the need for immediacy of reporting news "is even more vital in the digital age," where timeliness is measured in terms of minutes or seconds. We thus arrive at the question that lies at the core of this dispute: what amount of delay in making newly filed complaints publicly available is constitutionally justified?

## III.

### A.

Once we have determined that a qualified First Amendment right of access to newly filed nonconfidential civil complaints exists, a presumption of access arises under *Press-Enterprise II* that may be restricted only if "closure is essential to preserve higher values and is narrowly tailored to serve those interests." 478 U.S. at 13–14 (quoting *Press-Enterprise I*, 464 U.S. at 510); *see also Globe Newspaper Co.*, 457 U.S. at 606–07.

---

Group, Inc., Meredith Corporation, National Press Photographers Association, New England First Amendment Coalition, New England Newspaper and Press Association, Inc., The New York Times Company, News Media Alliance, Online News Association, Radio Television Digital News Association, Reporters Without Borders, Society of Professional Journalists, Student Press Law Center, Tully Center for Free Speech, and The Washington Post.

In *Globe Newspaper*, the Court reiterated that strict scrutiny applies to the denial of a qualified First Amendment right of access but noted that, "[o]f course, limitations on the right of access that *resemble* 'time, place, and manner' restrictions on protected speech, would not be subjected to such strict scrutiny." 457 U.S. at 607 n.17 (emphasis added) (internal citation omitted). The *Globe Newspaper* Court then cited to footnote 18 of *Richmond Newspapers*, where the Court, explaining that the First Amendment right of access is not absolute, analogized restrictions on access to judicial proceedings to the regulation of expression in the public square, reasoning that, "[j]ust as a government may impose reasonable time, place, and manner restrictions upon the use of its streets in the interest of such objectives as the free flow of traffic, so may a trial judge, in the interest of the fair administration of justice, impose reasonable limitations on access to a trial." 448 U.S. at 581 n.18. The Court, however, evinced greater solicitude for the courtroom setting that would countenance greater restrictions on access than those allowed in public forums, stating: "It is far more important that trials be conducted in a quiet and orderly setting than it is to preserve that atmosphere on city streets." *Id.* (comparing *Kovacs v. Cooper*, 336 U.S. 77 (1949), with *Illinois v. Allen*, 397 U.S. 337 (1970), and *Estes v. Texas*, 381 U.S. 532, 85 (1965)). The Court offered a final ground supporting reasonable restrictions in the courtroom setting— that courtrooms have limited capacity means that "there may be occasions when not every person . . . can be accommodated." *Id.* So too here.

Ventura County's access policies resemble time, place, and manner restrictions—they are content-neutral and affect

only the timing of access to the newly filed complaints.[8]
They should "not be subjected to such strict scrutiny," *Globe
Newspaper*, 457 U.S. at 607 n.17, but to the more relaxed
scrutiny the Supreme Court has stated applies to these types
of cases. An incidental delay of the right of access does "not
pose such inherent dangers to free expression, or present
such potential for censorship or manipulations, as to justify
application of the most exacting level of First Amendment
scrutiny." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622,
661 (1994). Thus, in *Leigh v. Salazar*, a case concerning
restrictions on the press's right to observe a government
activity, we explained that the *Press-Enterprise II*
"balancing test" is "rigorous," but not strict, scrutiny.
677 F.3d at 900. That is the level of scrutiny we apply to the
limitation on access to newly filed complaints here.[9]

---

[8] We also note that there is no allegation that Ventura County's
access policies discriminate among media outlets in granting access to
newly filed complaints. Favoring one media organization over another
would "present serious First Amendment concerns." *Turner Broad. Sys.*,
512 U.S. at 659. And although there is some suggestion in Ventura
County's briefs that because CNS commercially profits from its access
to the complaints its First Amendment right is somehow diminished, to
be clear: profit motive is entirely irrelevant to the determination of a
news organization's First Amendment rights. "If a profit motive could
somehow strip communications of the otherwise available constitutional
protection, our cases from *New York Times* to *Hustler Magazine* would
be little more than empty vessels." *Harte-Hanks Commc'ns, Inc. v.
Connaughton*, 491 U.S. 657, 667 (1989).

[9] Our concurring colleague misapprehends the level of scrutiny we
apply here, which is drawn directly from the Court's access to judicial
proceedings cases, *Globe Newspapers*, 457 U.S. at 607, n.17, and
*Richmond Newspapers*, 448 U.S. at 581, n.18. The concurrence would
instead have us scrutinize the limitation on access here under the
standard applicable to speech in public forums, places that have been
used "time out of mind" for public assembly, communication, and

The interest Ventura County asserts to justify the delay in access is core to its functioning as a court: the fair and orderly administration of justice. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 n.20, 35 (1984) (acknowledging both "the government's substantial interest in protecting the integrity of the discovery process" and the "privacy interests of litigants and third parties" in civil litigation); *cf. Sorrell v. IMS Health Inc.*, 564 U.S. 552, 596 (2011) (affirming "the importance of maintaining 'privacy' as an important public policy goal"); *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 430 (1990) (recognizing that "administrative efficiency interests . . . are unusually compelling" in the antitrust regulation context). Even in this era of electronic filing systems, instantaneous public access to court filings, especially complaints, could impair the orderly filing and processing of cases with which clerk's offices are charged. After all, litigants are not uploading their complaints to the internet; they are filing them with a court, making them subject to judicial administration. The First Amendment does not require courts, public entities with limited resources, to set aside their judicial operational needs to satisfy the immediate demands of the press.

---

expression, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939)), or that the government has designated as such, *see Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). But the courthouse is decidedly not a traditional or designated public forum for expression; rather it is "dedicated to the unique societal function of conducting the administration of justice." 1 Rodney A. Smolla, *Smolla and Nimmer on Freedom of Speech* § 8:32.50 (2016). And the third prong of the time, place and manner test, whether the regulations "leave open ample alternative channels for communication of the information," is inapplicable in this context—there is only one way CNS can access the new complaints: the court clerk's office.

To survive *Press-Enterprise II*'s two-prong balancing test, Ventura County must demonstrate first that there is a "substantial probability" that its interest in the fair and orderly administration of justice would be impaired by immediate access, and second, that no reasonable alternatives exist to "adequately protect" that government interest. *Press-Enterprise II*, 478 U.S. at 14.

**B.**

Although Ventura County has a substantial interest in the orderly administration and processing of new complaints, its former no-access-before-process policy nevertheless fails both prongs of *Press-Enterprise II*.

As to the first prong of *Press-Enterprise II*, Ventura County has not shown a "substantial probability" that more contemporaneous access to the newly filed complaints would impair its interest in orderly administration. The record shows that Ventura County's no-access-before-process policy bears no real relationship to the County's legitimate administrative concerns about privacy and confidentiality, accounting protocols, quality control and accuracy, efficient court administration, or the "integrity" of court records. The record shows that the no-access-before-process policy resulted in significant delays before the newly filed complaints found their way into the media bins and that these delays were unrelated to Ventura County's asserted administrative interests. The policy did not protect the privacy interest: it was stipulated that the complaints did not contain private or confidential information; rather, Planet's Deputy, Kanatzar, testified that private information is instead listed in fee waiver applications. And, as the district court noted, California Rule of Court 1.201(b) requires the filer—not the court—to exclude or redact private information from publicly filed judicial documents. Nor did

the policy protect the asserted accounting interest. Planet could point to no instances of accounting issues that related to providing access before processing. The policy also failed to protect Ventura County's interest in orderly administration: Planet failed to cite a single example of a situation in which providing pre-process access to a newly filed complaint compromised the quality and accuracy of information logged into the Court Case Management System (CCMS). As for efficiency, Planet again could not point to any situation in which providing pre-process access created efficiency problems. Finally, concerning the "integrity" of court records, which appears to encompass properly handling litigants' documents by attaching the correct fees to filings and removing private information, neither Planet nor Kanatzar testified that providing reporters pre-process access to complaints resulted in loss, destruction, or mutilation of, or otherwise compromised the "integrity" of, case files.

In fact, the record demonstrates that the lengthy delays under the no-access-before-process policy were entirely unrelated to Ventura County's asserted governmental interests. Although the policy's labyrinthine seven-step pre-access procedures purported to protect the orderly administration of court filings, a staff supervisor testified that there was "no way" she could confirm whether complaints designated "located to the media bin" in CCMS in fact made it to the physical media bin that day—a result that cuts against Ventura County's assertion that its policies were designed for proper court recordkeeping. Given that the no-access-before-process policy in some cases harmed the very interests Ventura County claimed to be trying to protect, we find that this policy fails the first prong of *Press-Enterprise II* scrutiny.

This policy also fails the second prong of *Press-Enterprise II* because it caused far greater delays than were necessary to adequately protect Ventura County's administrative interests given the reasonable alternatives available. It is undisputed that the policy resulted in substantial and meaningful delays in access to complaints, at times delaying access for up to two weeks. These delays compromised the newsworthiness of reporting on complaints and deprived the public of information without any administrative justification. During several documented periods between 2012 and 2014, it took two or more court days for CNS to access one-fifth to two-thirds of newly filed complaints:

| Time Period | Same Day (%) | Next Day (%) | 2+ Day (%) |
|---|---|---|---|
| June 11–22, 2012 | 0 | 55 | 45 |
| Dec. 10–21, 2012 | 2 | 46 | 52 |
| Aug. 12–23, 2013 | 0 | 67 | 33 |
| Mar. 24–Apr. 4, 2014 | 3 | 32 | 65 |
| Apr. 14–25, 2014 | 14 | 66 | 20 |

Record evidence also demonstrates that Ventura County could effectively address its administrative concerns through methods that did not cause such extensive and arbitrary delays in access. Ventura County's decision to adopt the scanning policy, which measurably decreased the delay in public and press access to complaints, demonstrated that it could achieve its administrative interests with substantially less restrictive means. The record additionally shows that Planet and his staff considered but rejected potential

alternatives providing timelier public access to complaints. For example, Ventura County considered making copies of newly filed complaints or requiring parties to submit an extra copy upon filing for more immediate public access. Although it is unclear why Ventura County ultimately declined to adopt these alternative procedures, Planet articulates no reasons why creating or requiring additional copies would unduly burden court resources or otherwise present administrative difficulties, declaring only that Ventura County "made the commonsense decision" not to require litigants to submit an extra copy of filed complaints. *See Valley Broad. Co. v. U.S. Dist. Court*, 798 F.2d 1289, 1295 (9th Cir. 1986) (holding that courts "must carefully state the articulable facts demonstrating an administrative burden sufficient to deny access" to judicial records). The ready availability of alternative "simple measures" to improve access to newly filed complaints, *Planet I*, 750 F.3d at 791, further strengthens our conclusion that the no-access-before-process policy fails the second prong of *Press-Enterprise II*.

## C.

Ventura County's scanning policy, which requires court staff to scan new civil complaints and make the electronic scans available on public computer terminals, survives *Press-Enterprise II* scrutiny.[10]  This policy easily passes the

---

[10] Planet argues that Ventura County's adoption of its scanning policy moots CNS's challenge to its now-discontinued no-access-before-process policy.  We agree with the district court that CNS's challenge to Ventura County's no-access-before-process policy is not moot.  "The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed."  *Am. Diabetes Ass'n v. U.S. Dep't of the Army*, 938 F.3d 1147, 1152 (9th Cir.

first prong of the test given that it is directly related to Ventura County's asserted interests. In fact, Planet testified that adopting a scanning policy addressed his concerns about privacy, potential accounting protocol problems, and quality control review in Ventura County's complaint processing procedures. Thus, there is a substantial probability that Ventura County's interest in the fair and orderly administration of new judicial filings would be impaired if the scanning policy was not in place.

We must now turn to the second prong of the *Press-Enterprise II* test: whether there were no reasonable alternatives available for adequately protecting the Ventura County's interest in fair and orderly administration at the time it adopted the scanning policy. When examining the availability of reasonable alternatives, we cannot ignore the modified, post-injunction scanning policy that Ventura County instituted in July 2016. Under this policy, the court

---

2019) (quoting *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014)). In the case of a government defendant, "[w]e presume that a government entity is acting in good faith when it changes its policy, but when the Government asserts mootness based on such a change it still must bear the heavy burden of showing that the challenged conduct cannot reasonably be expected to start up again." *Rosebrock*, 745 F.3d at 971 (internal citation omitted).

In *Rosebrock*, we set out a non-exhaustive list of factors to consider in determining whether a government defendant's voluntary cessation of challenged conduct moots a controversy, where, as here, the cessation is not enshrined in legislation or regulation. *See id.* at 972. Because Planet maintains that the public has no right of access until judicial action upon a complaint, and nothing other than the injunction in this litigation prevents Ventura County from returning to its pre-2014 policy, the district court correctly found that, unlike the defendant in *American Diabetes Association*, Planet has likely not met "the heavy burden of showing that the challenged conduct cannot reasonably be expected to start up again." *Id.* at 971.

extended the hours it keeps its clerk's office and filing counters open to the public from 3:00 PM to 4:00 PM, but also moved the filing deadline back from 4:30 PM to 4:00 PM. The changes extended the time during which the public has access to newly filed complaints but reduced the time within which the public may file complaints. It has also resulted in CNS reporting "near perfect" same-day access under the post-injunction scanning policy.

However, we are satisfied that the post-injunction scanning policy was not a reasonable alternative available to Ventura County when it implemented its scanning policy in 2014. Prior to 2014, a statewide budget crisis severely curtailed Ventura County's resources, cutting the court's budget by more than $13 million over three fiscal years. To mitigate the impact of the resulting multimillion-dollar shortfall, Ventura County reduced staff, increased mandatory staff furlough days, and twice reduced the courthouse closing time: from 5:00 PM, its "traditional" closing time, to 4:00 PM and then to 3:00 PM. Under the court's necessary budget control measures, administrative vacancies more than doubled, leaving fewer staff to scan all relevant complaints, serve members of the public seeking to file and view documents, and prepare court calendars. As Planet explained, Ventura County's earlier public closing time thus "allow[ed] a reduced number of clerks to catch up on the new filings before leaving work at 4:30."

Unlike with the no-access-before-process policy, there is nothing in the record to indicate that Ventura County considered but rejected reasonable alternatives to the scanning policy. Furthermore, Ventura County was undergoing severe budget constraints at the time, and it has demonstrated that the overnight delay in access to complaints filed during the last ninety minutes of the court's

public hours was no greater than essential to manage necessary court operations under the circumstances existing at the time. The First Amendment does not require us to second guess the careful deliberations the state court undertook in deciding how to manage scarce resources. We decline do so here.

We therefore conclude that Ventura County's scanning policy passes constitutional scrutiny.

## IV.

The First Amendment secures a right of timely access to publicly available civil complaints that arises before any judicial action upon them. Our decision reflects the First Amendment's "role . . . in securing and fostering our republican system of self-government" through informed and robust public debate. *Richmond Newspapers*, 448 U.S. at 587 (Brennan J., concurring in the judgment). "The guarding of the freedom of public discussion is a preliminary step in the unending attempt of our nation to be intelligent about its own purposes." Alexander Meiklejohn, *Free Speech and Its Relation to Self-Government* 106 (1948). While the incidental delays resulting from Ventura County's former no-access-before-process policy cannot survive *Press-Enterprise II* scrutiny, its scanning policy passes constitutional muster.

Accordingly, we affirm the district court's grant of summary judgment as to the no-access-before-process policy, but reverse the district court's grant of summary judgment as to the scanning policy. We vacate the district court's injunction and award of fees, and remand for further consideration consistent with this opinion.

Each side shall bear its own costs.

**AFFIRMED IN PART; REVERSED IN PART; and REMANDED for further proceedings consistent with this opinion.**

---

N.R. SMITH, Circuit Judge, concurring as to Part III:

Applying strict scrutiny to determine whether a state court system may regulate the public's access to nonconfidential civil complaints does not comply with Supreme Court precedent. Instead, reasonable time, place and manner restrictions should be applied. Let me explain.

## A.

Once it is determined that a qualified First Amendment right of access attaches to a government proceeding or activity, a court must then determine the proper level of scrutiny, "because not every interference with speech triggers the same degree of scrutiny under the First Amendment." *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 637 (1994). When "the State attempts to deny the right of access . . . , it must be shown that the denial is necessitated by a compelling governmental interest." *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606–07 (1982). However, the Supreme Court has repeatedly stated that "limitations on the right of access that resemble 'time, place, and manner' restrictions on protected speech [sh]ould not be subjected to such strict scrutiny." *Id.* at 607 n.17 (citations omitted); *see also Richmond Newspapers Inc. v. Virginia*, 448 U.S. 555, 581 n.18 (1980) (plurality opinion) ("Just as a government may impose reasonable time, place, and manner restrictions . . . so may a trial judge . . . impose reasonable

limitations on access to a trial." (citation omitted)).[1] Thus, a limitation on a First Amendment right of access is not subject to the same strict scrutiny applied to a denial of access. *See Globe Newspaper*, 457 U.S. at 606–07.

The time, place, and manner standard permits government regulation "provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)). This framework strikes the proper "balance[] [between] the vital public interest in preserving the media's ability to monitor government

---

[1] Multiple circuit courts have reached the same conclusion. *See Flynt v. Rumsfeld*, 355 F.3d 697, 705 (D.C. Cir. 2004) (recognizing that a restriction on media's right of access is permitted if it is a reasonable time, place, and manner restriction); *Globe Newspaper Co. v. Pokaski*, 868 F.2d 497, 505 (1st Cir. 1989) (recognizing that time, place, and manner restrictions "need only be reasonable to survive First Amendment scrutiny"); *United States v. Kerley*, 753 F.2d 617, 620–21 (7th Cir. 1985) (holding "[a] *limitation* on the public access to a trial is not subject to the same 'strict scrutiny' given a denial of access. . . . The limitation can withstand constitutional scrutiny so long as it is reasonable and neutral, as with time, place, and manner restrictions generally"); *United States v. Yonkers Bd. of Educ.*, 747 F.2d 111, 114 (2d. Cir. 1984) (holding a limitation that "is simply a 'time, place, and manner' restriction, which should not be subjected to strict scrutiny, but should be upheld if reasonable"); *United States v. Hastings*, 695 F.2d 1278, 1282 (11th Cir. 1983) (holding that a time, place, and manner regulation that restricts access in the courtroom is constitutional "if it is reasonable, if it promotes significant governmental interests, and if the restriction does not unwarrantedly abridge . . . . the opportunities for the communication of thought" (alterations in original) (quotations marks and footnotes omitted)).

activities against the government's need to impose restrictions if necessary for safety or other legitimate reasons." *Leigh v. Salazar*, 677 F.3d 892, 900 (9th Cir. 2012).

Under the time, place and manner framework, the first step is to determine if the policy is content-neutral. To be content-neutral, the policy cannot "target speech based on its communicative content," *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015), or "draw[] distinctions based on the message a speaker conveys," *id.* at 2227. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791; *see also Press-Enter. Co. v. Superior Court* ("*Press-Enter. I*"), 464 U.S. 501, 519 (1984) (Stevens, J., concurring) (explaining that, while it is sometimes necessary to identify limitations "by reference to the subject matter of certain questions" but this would not amount to an improper content-based regulation, because in this context, the government is not violating the principle of neutrality).

Once it is determined that the policy is content-neutral, the regulation must be "narrowly tailored to serve a significant governmental interest." *McCullen v. Coakley*, 573 U.S. 464, 477, 486 (2014). To be narrowly tailored, the restriction need not employ "the least restrictive or least intrusive means." *Ward*, 491 U.S. at 798. Rather, this court must ensure "the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* at 799 (alteration omitted) (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1989)). For example, in *Clark*, the Court explained how the prohibition on camping on the National Mall served purposes that "[p]erhaps . . . would be more effectively and

not so clumsily achieved by preventing tents and 24-hour vigils entirely in the core areas." 468 U.S. at 297. But because "the Government has a legitimate interest in ensuring that the National Parks are adequately protected . . . [and] the parks would be more exposed to harm without the sleeping prohibition than with it, the ban [wa]s safe from invalidation under the First Amendment as a reasonable regulation of the manner in which a demonstration may be carried out." *Id.*

However, an access policy may fail the requirement for "narrow tailoring" if the burdens imposed serve *no* purpose. *See Ward*, 491 U.S. at 799–800. In other words, the regulation must actually advance the government's interest. *See id.*; *see also McCullen*, 573 U.S. at 486 ("[T]he government still may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." (internal quotation marks omitted)).

Finally, the policy must leave open ample alternative channels of communication.[2] *McCullen*, 573 U.S. at 477. Access policies that merely delay (rather than outright deny) access to nonconfidential civil complaints will generally satisfy this requirement. *See Daily Herald Co. v. Munro*, 758 F.2d 350, 359 (9th Cir. 1984) (per curiam) (finding unconstitutional a state statute that outright denied media organizations' ability to conduct exit polling). *But see Richmond Newspapers*, 448 U.S. at 581 n.18 (explaining that courts may outright deny access when, due to "limited capacity . . . not every person who wishes to attend can be

---

[2] The Majority argues that this prong of the time, place, and manner test is "inapplicable in this context." Maj. Op. at 26 n.9. However, as detailed in this section, this prong is applicable in access cases.

accommodated"). In such cases of delayed access, the question boils down to whether the delay "den[ies] or unwarrantedly abridge[s] the opportunities for the communication of thought and the discussion of public questions immemorially associated with resort to public places." *Id.* (quoting *Cox v. New Hampshire*, 312 U.S. 569, 574 (1980)); *see also Courthouse News Serv. v. Planet*, 750 F.3d 776, 787 (9th Cir. 2014) ("*Planet I*") (explaining how limiting access can deter "informed public discussion of ongoing judicial proceedings"); *cf. Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 492 (1975) (recognizing one of the functions of the press is to "bear the beneficial effects of public scrutiny").

The parties argue that reporting on complaints must be timely to be newsworthy and to allow for ample and meaningful public discussion regarding the functioning of our nation's court systems. *See Globe Newspaper*, 457 U.S. at 604–05; *Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897–98 (7th Cir. 1994), *superseded by rule on other grounds*. As the Seventh Circuit explained in *Grove Fresh*: "The newsworthiness of a particular story is often fleeting. To delay or postpone disclosure undermines the benefit of public scrutiny and may have the same result as complete suppression." 24 F.3d at 897.

However, timeliness and newsworthiness are not the focus of the First Amendment analysis. Rather, the First Amendment analysis focuses on the significant government interest and whether the restriction is narrowly tailored to meet that interest. Absent either an unreasonable burden on the right of access or access restrictions that also operate as limitations on publishing information previously obtained, ample alternatives for communication are left open. *Houchins* v. *KQED, Inc.*, 438 U.S. 1, 10–12 (1978)

(distinguishing a right of access from a right to publish information that has been obtained); *Globe Newspaper*, 457 U.S. at 621 (Stevens, J., dissenting) ("[S]tatutes that bear on th[e] right of access do not deter protected activity in the way that other laws sometimes interfere with the right of expression . . . .").

The majority correctly determines that "Ventura County's access policies resemble time, place, and manner restrictions—they are content-neutral and affect only the timing of access to the newly filed complaints." Maj. Op. 25–26. However, rather than adopt the time, place, and manner test, the majority ignores Supreme Court precedent by analyzing the access policies under strict scrutiny.[3] Again, the Supreme Court has repeatedly held that "limitations on the right of access that resemble 'time, place, and manner' restrictions on protected speech [sh]ould not be subjected to . . . strict scrutiny." *Globe Newspaper*, 457 U.S. at 607 n.17; *see also Richmond Newspapers*, 448 U.S. at 581 n.18 ("Just as a government may impose reasonable time, place, and manner restrictions . . . , so may a trial judge . . . impose reasonable limitations on access to a trial.").

---

[3] The majority mistakenly claims that its level of scrutiny is drawn directly from *Globe Newspapers* and *Richmond Newspapers*. Maj Op. at 26 n.9. This cannot be the case. These two Supreme Court cases direct us not to use strict scrutiny when an access policy resembles a reasonable time, place, and manner restriction. *See Globe Newspaper*, 457 U.S. at 607 n.17; *Richmond Newspapers*, 448 U.S. at 581 n.18.

The majority further mistakenly argues that the time, place, and manner standard is only applicable to speech in public forums. Maj Op. at 26 n.9. However, the Supreme Court explicitly stated time, place, and manner restrictions may be used in courtroom access cases. *See Richmond Newspapers*, 448 U.S. at 581 n.18.

As an alternative to a time, place, and manner analysis, the majority instead suggests that a straightforward application of the *Press-Enterprise Co. v. Superior Court* (*Press-Enterprise II*), 478 U.S. 1 (1986) test should be used; suggesting that it is not the most exacting level of First Amendment scrutiny, but is instead akin to a "'balancing test' that provides 'rigorous,' but not strict, scrutiny." Maj. Op. 26 (citing *Leigh*, 677 F.3d at 900).[4] However, to comply with the scrutiny required by *Press-Enterprise II*, the policy must be "narrowly tailored and necessary to preserve the court's important interest in the fair and orderly administration of justice." Maj. Op. 6. In other words, "no reasonable alternatives exist to 'adequately' protect that government interest." Maj. Op. 28. Thus, this "no reasonable alternative" requirement mirrors the same strict scrutiny analysis Supreme Court precedent does not require. *See Daily Herald Co.*, 758 F.2d at 359 (holding that to meet the heavy burden of "exacting scrutiny" the State must prove that "no reasonable alternatives" are available to serve the State's legitimate interest).

Because the majority's strict scrutiny analysis does not comply with Supreme Court precedent, I part company with them.

**B.**

Because the Ventura county access policies resemble time, place, and manner restrictions, such access policies

---

[4] The majority cannot rely on *Leigh*, because *Leigh*'s use of the word rigorous was merely dicta. *Leigh* was not holding that *Press-Enterprise II*'s test is anything less than strict scrutiny. *See Leigh*, 677 F.3d at 900. Further, to the extent that *Leigh* dictates applying *Press-Enterprise II*'s strict scrutiny test here, we should call this case en banc to determine whether our circuit's precedent follows Supreme Court precedent.

should be reviewed under the time, place, and manner test as the Supreme Court would do. Scrutinizing Ventura County's access policies as time, place, and manner regulations, the Ventura County's pre-2014 no-access-before-process policy unconstitutionally deprived Courthouse News Service ("CNS") of its right to timely access newly filed complaints. However, Ventura County's original scanning policy (closing the clerk's office with the complaint-viewing computer terminals at 3:00 PM) survives scrutiny.

**1.**

Applying the time, place, and manner test, Ventura County's pre-2014 no-access-before-process policy does not reasonably regulate public access to civil complaints.

On one hand, the policy is content neutral. The regulation does not "target speech based on its communicative content," *Reed*, 135 S. Ct. at 2226, or draw distinctions "based on the message a speaker conveys," *id.* at 2227. The reasons Planet asserts for limiting access to civil complaints until after processing are significant governmental interests. Planet asserts an interest in the fair and orderly administration of justice through maintaining (1) privacy and confidentiality, (2) accounting protocols, (3) quality control and accuracy, and (4) the integrity of court records. These interests are sufficiently important to justify some delay in access resulting from its policies. *See Press-Enterprise I*, 464 U.S. at 511–12; *Grove Fresh*, 24 F.3d at 897–98; *see also Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 n.20, 35 (1984) (acknowledging both "the government's substantial interest in protecting the integrity of the discovery process" and the "privacy interests of litigants and third parties" in civil litigation); *cf. Sorrell v. IMS Health Inc.*, 564 U.S. 552, 596 (2011) (affirming "the importance of maintaining 'privacy' as an important public

policy goal"); *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 430 (1990) (recognizing "administrative efficiency interests" as compelling in the antitrust regulation context).

However, Planet must also demonstrate that the access policy actually advanced Ventura County's important governmental interests. *See Ward*, 491 U.S. at 799–800. Here, Planet fails the analysis. He cannot explain how "processing" the complaints before making them available to the press furthered his stated reasons for the policy. In other words, Planet offered no connection between the means he chose and the ends he pursued. For example, the policy did not advance the privacy interest: it was stipulated that the complaints already did not contain private or confidential information; rather, Kanatzar testified that private information is instead listed in fee waiver applications. And, as the district court noted, California Rule of Court 1.201(b) requires the filer—not the court—to exclude or redact private information from publicly filed judicial documents.

Nor did the policy advance the asserted accounting interest. Planet could point to no instances of accounting issues that related to providing access before processing. Nor did the policy further Ventura County's interest in orderly administration: Planet failed to cite a single example of a situation in which providing pre-process access to a newly filed complaint compromised the quality and accuracy of information logged into the Court Case Management System ("CCMS"). As for efficiency, Planet again could not point to any situation in which providing pre-process access created efficiency problems.

Finally, concerning the "integrity" of court records, which appears to encompass properly handling litigants'

documents by attaching the correct fees to filings and removing private information, neither Planet nor Kanatzar testified that providing reporters access to complaints before processing resulted in loss, destruction, or mutilation of, or otherwise compromised the "integrity" of case files. Indeed, even the interest in proper court record keeping remains unserved by the pre-access process; a staff supervisor testified that there was "no way" she could confirm whether complaints recorded as "located to the media bin" in CCMS were physically "located to the media bin."

Accordingly, the no-access-before-process policy infringed upon CNS's right of access by institutionalizing delay that extended wait periods for a large portion of complaints that stretched over days, even weeks. Because the delays in access under the no-access-before-process policy failed to further Ventura County's important governmental interests, the no-access-before-process policy is not a reasonable regulation of the right of timely access to newly filed complaints.[5]

**2.**

Turning to Ventura County's post-2014 scanning policy, this policy is a reasonable, content-neutral time, place, and manner restriction.[6] This policy requires court staff to scan

---

[5] Because I find that Planet's no-access-before-process policy was not narrowly tailored, I do not analyze whether it left open ample alternative channels for communication and information.

[6] The concerning consequences of the district court's conclusion that the 2014 scanning policy violated the First Amendment illustrate why a federal court reviewing a state court access policy must tread carefully. In 2016, responding to the district court, Ventura County shortened the

complaints into PDF-formatted documents prior to processing the complaint. The scanned PDFs are then made available to the public for 10 days through public computer terminals, and paper copies are available for a per-page charge.

As with the no-access-before-process policy, this policy is facially content-neutral. The policy is also narrowly tailored to serve a significant governmental interest. Planet asserts the same significant interests with this policy as with the no-access-before-process policy—the policy was necessary for the fair and orderly administration of justice. But, unlike the no-access-before-process policy, Planet testified that this policy satisfied the administrative concerns about privacy, accounting protocol issues, and quality control. Thus, the policy advanced the substantial interest of fair and orderly administration of justice, and that interest would be achieved less effectively absent the regulation. *See Ward*, 491 U.S. at 798–99.

Finally, the policy also left open ample alternative channels for communication and information. The policy did nothing to deny or unwarrantedly abridge the opportunities for the communication of thought. The reporters were still able to get the complaints in a timely enough manner to report on newsworthy issues. These minor delays did nothing to deter the "informed public discussion of ongoing judicial proceedings." *Planet I*, 750 F.3d at 787.

---

window for *litigants*—the primary stakeholders of the civil court system—to file complaints.